SCIT, INC. *vs.* PLANNING BOARD OF BRAINTREE & another.[1]

Norfolk.   September 10, 1984. — December 21, 1984.

Present: GREANEY, C.J., CUTTER, & WARNER, JJ.

*Zoning*, Special permit, Validity of by-law or ordinance.

A provision in a zoning by-law conditioning all uses in a business district on
the grant of a special permit by the planning board was held to be invalid
as conflicting with the uniformity requirement of G. L. c. 40A, § 4,
and exceeding the scope of the delegation respecting special permits
fixed by G. L. c. 40A, § 9. [106-111]

CIVIL ACTION commenced in the Superior Court Department
on February 10, 1983.

The case was heard by *Paul G. Garrity*, J.

*Robert T. Smart, Jr.*, for the defendants.

*Charles C. Ames* for the plaintiff.

GREANEY, C.J. Although many issues have been argued,
we need only decide one question in this case: whether the
Braintree zoning by-law may make, consistent with G. L.
c. 40A, The Zoning Act,[2] *all* uses in a business district condi-
tional on the issuance of a discretionary special permit.

SCIT, between 1960 and 1981, was the primary developer
of approximately ninety-one acres of land in a business district
located at the junction of Routes 3, 37, and 128 in Braintree.
On seventy-one acres of its land, SCIT developed the South
Shore Plaza, a shopping and business complex containing
1,300,000 square feet of mixed commercial and retail space.

---

[1] The town of Braintree.

[2] All references in this opinion, unless otherwise noted, are to c. 40A,
The Zoning Act, as appearing in St. 1975, c. 808, § 3.

On the remaining twenty acres of so-called "fringe land" SCIT constructed commercial buildings and maintained parking.[3]

SCIT has always intended to develop an office building on the "fringe land." (An office building is a permitted use in the district subject to certain dimensional and other requirements which are not in controversy.) Despite the permitted nature of the use, SCIT was required by § 135-604 of the Braintree zoning by-law to apply for a special permit for the construction of its office building. In January, 1980, SCIT applied to the planning board for the required special permit to construct an 80,000 square foot office building on the "fringe land." SCIT's application for the special permit was accompanied by a "written traffic analysis performed by a recognized traffic consultant" as required by art. II, § 3, of the planning board's regulations. The town's police chief approved the application (he being the municipal officer directly concerned with traffic) and the board unanimously granted the permit. The Superior Court upheld the board's action against a challenge by area residents. SCIT, however, never commenced construction under the permit.

In December, 1981, SCIT sold all the developed land to Corporate Property Investors, retaining two parcels on the "fringe land": the parcel containing the telephone company building and a parcel containing 4.39 acres of vacant land. SCIT decided to move the site of its proposed office building to the 4.39 acre parcel, relocate the building from one side of a service road to another, and expand the size of the building from 80,000 square feet to 92,700 square feet.[4] On August 23, 1982, SCIT applied anew to the planning board, pursuant to § 135-604 of the by-law, for a special permit. SCIT submitted detailed plans with its application which included a new traffic impact report prepared by a qualified traffic engineer.

---

[3] The commercial buildings presently on the "fringe land" include a General Cinema theatre, a Howard Johnson's restaurant, and a telephone company building.

[4] The expanded office building would still have only four stories. The availability of a larger lot (4.39 acres as distinguished from 3.35 acres) permitted SCIT to increase the square footage of the proposed building by 12,700 square feet.

After a public hearing on January 18, 1983, the board voted (two to one) to deny SCIT's application for a special permit. The only reason stated in the board's decision was that "the proposed project has failed to obtain a positive recommendation from the Police Department." On that point, the decision referred to two letters from the police chief which indicated that the chief's opposition to the project was based on his opinion that traffic capacity of the roadways adjoining the locus had been reached.[5]

SCIT appealed the board's decision by filing a complaint in the Superior Court pursuant to G. L. c. 40A, § 17. After an evidentiary hearing, held in accordance with the de novo procedure described in *Josephs* v. *Board of Appeals of Brookline*, 362 Mass. 290, 295 (1972), a judge of the Superior Court annulled the board's decision and ordered the issuance of the special permit. The judge concluded, on the facts he found, that the board was "without authority to deny SCIT a special permit except upon grounds expressly stated in the [b]y-law" and that the board had acted arbitrarily in denying the special permit "solely on the ground that the Braintree [p]olice [d]epartment recommended against the application because of its concern about traffic." The board and town have appealed from the judgment, which orders issuance of the special permit.

1. The Braintree zoning by-law, adopted in 1981, is, in general, based upon a traditional Euclidean classification scheme.[6] Section 135-301 of the by-law divides the town into

---

[5] In the interim between 1980 and 1982, the planning board had granted several other special permits in the same area, including permits for a 100,000 square foot office building and a 40,500 square foot addition to another office building. Traffic from both of those developments uses the same routes as traffic from SCIT's proposed building. As indicated, the board denied SCIT's application because it failed to obtain a positive recommendation from the police chief due to potential traffic congestion, a factor brought about, at least in part, by the grant of the two other special permits.

[6] The zoning laws of Massachusetts (and forty-six other States) are based primarily upon the Standard Zoning Enabling Act, which was drawn up under the auspices of the United States Department of Commerce in the 1920's. See 1 Williams, American Land Planning Law § 18.01 (1974). Both uniform districts and special permits (then called "special exceptions") were included in the standard act. The system of zoning codified by the

seven use districts, ranging in restrictiveness from residential to business and industrial.[7] Article VI of the by-law, and its various sections, spell out the uses permitted as of right in each district and provide, in some districts, for conditionally permitted uses which will be "subject to approval by the special permit granting authority" (the planning board).[8]

In business districts, governed by § 135-605 of the by-law, numerous uses including offices are set out as permitted as of right,[9] with only filling stations or garages requiring approval by the zoning board of appeals as the permit granting authority. Arching over all uses in a business district, however, are the separate provisions of § 135-604 of the by-law which provide that "[a]ll proposed development in . . . [b]usiness districts shall be by special permit submitted to the special permit granting authority for approval."[10] The word "development" is

---

standard act is often referred to as "Euclidean" zoning based upon the seminal Supreme Court case which upheld the lawfulness of dividing a municipality into districts for the purpose of imposing land-use restrictions. *Euclid* v. *Ambler Realty Co.,* 272 U.S. 365 (1926). See 1 Anderson, American Law of Zoning § 3.09 (2d ed. 1976).

[7] There are three classes of residential districts (A, B and C) which permit the uses usually seen in residential districts such as single family homes, schools, houses of worship, private clubs, etc. In addition to the residential districts, there are business and industrial districts, a fire district, and a flood plain and watershed protection district.

[8] In other districts, certain uses are allowed only "if authorized by the permit granting authority" (the zoning board of appeals).

[9] In addition to offices, the uses in a business district encompass the uses permitted in the three classes of residence districts and municipal uses, newspaper or job printing, banks, places of amusement or assembly, restaurants, motels and hotels, retail, service or public utility uses, and professional offices.

[10] The full text of § 135-604 relating to development in a business district reads as follows: "All proposed development in . . . . Business Districts shall be by special permit submitted to the special permit granting authority for approval. Such development proposal shall be submitted on plan and profile drawings by a qualified engineer as required by Planning Board Rules and Regulations. Such proposals shall include but not be limited to access-egress, lot lines, utilities, topography, wetlands, building sites and buildings sizes and *proposed uses,* parking facilities, accessory structures and signs. The authority shall evaluate and act upon said plans as provided in Article V. Copies of decisions shall be submitted to the Building Inspector,

broadly defined by § 135-102 of the by-law to include, "Any man-made change to improve or unimprove real estate, including but not limited to buildings or other structures, mining, dredging, filling, grading, paving, excavation or drilling operations." There is no doubt that the effect of § 135-604 is to make *every* use in a business district subject to the grant of a special permit by the planning board (and apparently in the case of a filling station or a garage permit approval from both the planning board and the zoning board of appeals). The board and town concede that this is indeed the effect of § 135-604, and admit that the provision was purposely adopted to authorize the considerable discretion conferred by established Massachusetts case law on special permit granting authorities to grant or deny special permits.[11] The board and town further concede, as we think they must, that § 135-604 cannot be construed as calling simply for site plan approval.[12] Finally, it is

the Board of Appeals, the Conservation Commissioner, the Board of Health, the Board of Selectmen, the Sewer Commissioner and the Water Commissioner." (The emphasis is supplied to show that the term "proposed development" overlaps, and includes, the term "proposed uses".)

[11] The broad power of a local board in the special permit area has been commented upon in a number of decisions of which *Humble Oil & Refining Co.* v. *Board of Appeals of Amherst*, 360 Mass. 604, 605 (1971), and *Subaru of New England, Inc.* v. *Board of Appeals of Canton*, 8 Mass. App. Ct. 483, 486 (1979), state the relevant principles concerning a denial of a special permit. See also (as a sampling of decisions on both the grant and denial of special permits), *Sellors* v. *Concord*, 329 Mass. 259 (1952); *Gulf Oil Corp.* v. *Board of Appeals of Framingham*, 355 Mass. 275 (1969); *MacGibbon* v. *Board of Appeals of Duxbury*, 356 Mass. 635 (1970); *Josephs* v. *Board of Appeals of Brookline*, 362 Mass. 290 (1972); *Kiss* v. *Board of Appeals of Longmeadow*, 371 Mass. 147 (1976); *Pioneer Home Sponsors, Inc.* v. *Board of Appeals of Northampton*, 1 Mass. App. Ct. 830 (1973); *S. Volpe & Co.* v. *Board of Appeals of Wareham*, 4 Mass. App. Ct. 357 (1976); and *S. Kemble Fischer Realty Trust* v. *Board of Appeals of Concord*, 9 Mass. App. Ct. 477 (1980).

[12] We asked for supplemental briefs to discuss whether § 135-604 could be given a site plan gloss. In their supplemental brief, the board and the town rejected any such interpretation, indicating to us, by reference to § 135-711 of the by-law (providing for site plan review for apartment development in a residence C district), that the drafters of the by-law knew

apparent that the only source of standards to guide the planning board in its decision whether to grant or deny a special permit under § 135-604 (besides area, height, density, and parking provisions of the variety common to most by-laws) are those described in the purposes clause of the by-law.[13]

2. The problem is not difficult to frame. The Zoning Act, G. L. c. 40A, has, with precision, set out limits on the exercise of zoning power by the municipality. In this case, Braintree has attempted to use the power delegated by The Zoning Act in a fashion which creates a logical inconsistency between §§ 135-605 and 135-604 of the by-law. The former provision identifies and authorizes specific uses as of right in a business district (with only filling stations and garages reserved for

---

how to provide for regulation by site plan review when they wanted it. We agree that a site plan construction cannot be given to § 135-604.

As to site plan approval as a permissible regulatory tool, attention is directed to *Y.D. Dugout, Inc.* v. *Board of Appeals of Canton*, 357 Mass. 25 (1970). In that case, a by-law which required site plan approval for all commercial development in nonresidential districts (but not for the residential uses permitted as of right in those districts) was upheld as a valid exercise of the town's zoning power. The Canton provision was narrowly confined by its terms to consider the public interest only "to a degree consistent with a reasonable use of the site for the purposes permitted or permissible by the regulations of the district in which located." *Id.* at 27. Furthermore, the by-law spelled out the specific factors the board should consider in awarding a special permit. The Supreme Judicial Court construed the provision to imply only regulation of a use rather than its outright prohibition. *Id.* at 31. The court noted that, if the specific area and use criteria stated in the by-law were satisfied, the board did not have discretionary power to deny a permit, but instead was limited to imposing reasonable terms and conditions on the proposed use. *Ibid.* See also, *Auburn* v. *Planning Bd. of Dover*, 12 Mass. App. Ct. 998 (1981).

[13] Section 135-101 of the by-law, entitled "Purposes" reads as follows: "This chapter is hereby established for the following purposes: to promote the health, safety, convenience and welfare of the town's inhabitants, to lessen congestion in the streets; to secure safety from fire, panic and other dangers; to provide adequate light and air; to prevent overcrowding of land; to avoid undue concentration of population; to encourage housing for persons of all income levels; to facilitate the adequate provision of transportation, water, sewerage system, schools, parks, open space and other public requirements; to conserve the value of lands and buildings; to encourage the most appropriate use of land throughout the town; to conserve natural resources, prevent blight and pollution of the environment; and to preserve and increase its amenities."

approval by permit), while the latter provision purports to make all uses in the same district dependent on the grant of a special permit. We see no reasonable way to reconcile the two provisions. Therefore, we ask: which should prevail? We conclude that the regulation of uses within a business district contemplated by § 135-604 is unlawful because the provision conflicts with the uniformity and special permit provisions of The Zoning Act.

Section 4 of c. 40A provides that "[a]ny zoning ordinance or by-law which divides cities and towns into districts shall be uniform within the district for each class or kind of structures or uses permitted." The basic assumption underlying the division of a municipality into zoning districts is that, in general, each land use will have a predictable character and that the uses of land can be sorted out into compatible groupings. See *Leahy* v. *Inspector of Bldgs. of New Bedford*, 308 Mass. 128, 132 (1941). Based upon this assumption, certain uses are permitted as of right within each district, without the need for a landowner or developer first to seek permission which depends upon the discretion of local zoning authorities. The uniformity requirement is based upon principles of equal treatment: all land in similar circumstances should be treated alike, so that "if anyone can go ahead with a certain development [in a district], then so can everybody else." 1 Williams, American Land Planning Law § 16.06 (1974).

These principles underpin § 4 of c. 40A, and have long constituted a limitation on municipal zoning power.[14] As was said on the subject in *Everpure Ice Mfg. Co.* v. *Board of Ap-*

---

[14] Similar requirements to those imposed by § 4 can be found in G. L. c. 40A, § 2 (as in effect prior to St. 1975, c. 808, § 3), of the prior The Zoning Enabling Act which provided, in pertinent part, as follows: "All such regulations and restrictions shall be uniform for each class or kind of buildings, structures or land, and for each class or kind of use, throughout the district, but the regulations and restrictions in one district may differ from those in other districts. Due regard shall be paid to the characteristics of the different parts of the city or town, and the zoning regulations in any city or town shall be the same for zones, districts or streets having substantially the same character."

*peals of Lawrence*, 324 Mass. 433, 439 (1949): "A zoning ordinance is intended to apply uniformly to all property located in a particular district . . . and the properties of all the owners in that district [must be] subjected to the same restrictions for the common benefit of all."

Some exceptions to uniformity are sanctioned by The Zoning Act and involve generally a limited tolerance for nonconforming uses (§ 6 of c. 40A) and provision for special permits and variances (§§ 9 and 10 of c. 40A, respectively). These exceptions aside, § 4 does not contemplate, once a district is established and uses within it authorized as of right, conferral on local zoning boards of a roving and virtually unlimited power to discriminate as to uses between landowners similarly situated. Section 135-604 attempts to do precisely that in direct contravention of § 4 of The Zoning Act. What was said by Justice Qua in *Smith* v. *Board of Appeals of Fall River*, 319 Mass. 341, 344 (1946), with respect to a by-law's violation of an earlier (but similar) version of the uniformity requirement, applies with equal force to § 135-604 and demonstrates why the attempt at regulation is bad: "Its provisions could be applied to a great number, if not to most, of the structures and [uses] in [a business] district and could be employed to break down one of the principal characteristics of the zoning system. It opened the door to discrimination not based upon valid difference. It purported to delegate to the [planning board] power to bring about situations where the regulations and restrictions would not be 'uniform for each class or kind of buildings, structures or land, and for each class or kind of use, throughout each district' as required by G. L. (Ter. Ed) c. 40, § 25 (second paragraph), as appearing in St. 1933, c. 269, § 1. . . . It attempted to delegate to the board . . . a new power to alter the characteristics of zoning districts, a power conferred . . . only upon the legislative body of the city to be exercised only in the manner prescribed by [G. L. c. 40A] . . . and it attempted to do this without furnishing any principles or rules by which the board should be guided, leaving the board unlimited authority to indulge in 'spot zoning' at its discretion or whim."

An equally serious problem for the validity of § 135-604 is posed by § 9 of c. 40A. The first paragraph of that section states: "Zoning ordinances or by-laws shall provide for *specific types of uses* which shall only be permitted in specified districts upon the issuance of a special permit. Special permits may be issued only for uses which are in harmony with the general purpose and intent of the ordinance or by-law, and shall be subject to general or specific provisions set forth therein; and such permits may also impose conditions, safeguards and limitations on time or use." (Emphasis supplied.) The role of the special permit in land use planning is not something new. Special permit procedures have long been used to bring flexibility to the fairly rigid use classifications of Euclidean zoning schemes (see 3 Anderson, American Law of Zoning § 19.01 [2d ed. 1977]; see also *Burnham* v. *Board of Appeals of Gloucester*, 333 Mass. 114, 116 [1955]) by providing for specific uses which are deemed necessary or desirable but which are not allowed as of right because of their potential for incompatibility with the characteristics of the district. See 3 Rathkopf, Zoning and Planning § 41.01, at 41-3 (4th ed. 1984). Uses most commonly subjected to special permit requirements are those regarded as troublesome (but often needed somewhere in the municipality, for example, gasoline service stations, parking lots, and automobile repair garages), see 3 Anderson, American Law of Zoning, *supra* at 19.06; and uses often considered desirable but which would be incompatible in a particular district unless conditioned in a manner which makes them suitable to a given location (for example, an apartment house in a single family residential district). Section 9 of 40A preserves the traditional outlines of the special permit power discussed above and provides for the use of special permits in certain new ways. See Bok & White, The New Zoning Act, 20 B.B.J. no. 2, 11-16 (Feb. 1976).[15]

---

[15] For example, § 9 of The Zoning Act authorizes the use of special permits for cluster developments, planned unit developments, and increases in density or intensity of use, none of which had been specified in The Zoning Enabling Act. The Zoning Act also expressly recognizes "bonuses" for the first time, providing that special permits which authorize increases in

Section 9 is unambiguous, however, in authorizing special permits only for "specific types of uses", and it is clear that this language was intended to mean exactly what is says. See 1972 House Doc. No. 5009, at 31, where it is said that special permits are to be "granted only for uses *specifically* authorized by the ordinance where it is appropriate to 'condition' the use or control its density or location" (emphasis original). We see no escape from the conclusion that § 135-604's purported conditioning of all uses in a business district on a special permit exceeds the scope of the delegation fixed by the unambiguous language of § 9.[16] We have reached our decision that § 135-604

density or intensity of use may be conditioned upon the provision of open space, low or moderate income housing, traffic or pedestrian improvements, or other amenities. See Bok & White, *supra* at 15.

[16] In addition to the main authority discussed in the text, decisions on the periphery of the subject further support the result. Reference has already been made to the *Y.D. Dugout Case*, see note 12, *supra*, which cautions that the site plan approach (about the most extensive method of limiting permitted uses approved by the courts) cannot be used to enforce outright prohibition under the guise of regulation. The decisions in *Cape Ann Land Dev. Corp.* v. *Gloucester*, 371 Mass. 19 (1976), *S.C.* sub nom. *Cape Ann Land Dev. Corp.* v. *City Council of Gloucester*, 374 Mass. 825 (1978), held that a protected use for shopping center development could not be made subject to the grant of a discretionary "major project" permit if the specific requirements of the zoning ordinance or other applicable building or sanitary code requirements had been met. Concern about traffic congestion was specifically identified in the second *Cape Ann* decision as an invalid ground of regulation in the circumstances pertaining there. Finally, in *McCaffrey* v. *Board of Appeals of Ipswich*, 4 Mass. App. Ct. 109, 112 (1976), we refused to interpret a by-law in a manner which would "abolish all uses as a matter of right and require a special permit for any use of land," declaring that "[a] by-law which provided only for special permits would be extraordinary to say the least." We also rejected an argument, made by the board, that general standards in The Zoning Act could provide sufficient guidance to a board in the exercise of any discretion it might possess, and would not create the right to condition permitted uses on the grant of special permits. We observed that "[t]he various parts of the by-law and The Zoning Enabling Act to which the zoning board refers suggest standards for the exercise of discretion where such discretion is otherwise provided. They are not themselves a source of discretion." *Ibid*. Nothing said in this opinion is to be taken as limiting the power of a special permit granting authority, where a special permit is required for a specifically authorized use, from denying the permit on the basis of a properly documented traffic congestion problem. See *Vazza Properties, Inc.* v. *City Council of Woburn*, 1 Mass. App. Ct. 308, 310-312 (1973).

cannot stand in light of §§ 4 and 9 of c. 40A having in mind the favorable presumption to which a zoning ordinance or by-law is entitled.[17] See *Collura* v. *Arlington*, 367 Mass. 881, 884-885 & n.3 (1975).

3. The judgment is vacated. A new judgment is to enter (a) declaring that § 135-604 of the Braintree zoning by-law, insofar as it applies to uses in a business district, is void; and (b) annulling the decision of the planning board as in excess of its authority. SCIT may apply to the building inspector pursuant to relevant provisions of the by-law for the issuance of a building permit. Any appeal from the inspector's decision is to be taken, in accordance with the by-law, to the zoning board of appeals. The Superior Court is to retain jurisdiction of the case for any further proceedings that may be necessary.

*So ordered.*

---

[17] As a last consideration, we point out that our decision does not leave Braintree without recourse to regulate development within a business district. The specific dimensional and density regulations, off-street parking and loading requirements, and environmental standards imposed by the by-law provide considerable limitation on the type and extent of development of any permitted use in such a district.

We also point out, without attempting to state an exhaustive list of permissible regulatory tools, the following additional possibilities which may be adopted to control cases. First, the town could amend its by-law to limit the number of permitted uses, to require site plan approval based upon specified standards (consistent with the details outlined in the *Y.D. Dugout* case, *supra*), or to impose more stringent requirements on all buildings in the district. Second, the town, if traffic is a problem in business districts, could adopt a by-law specifically designed to control traffic. Finally, the town could adopt a temporary "rate of development" by-law to control growth while it conducts comprehensive planning studies. See *Sturges* v. *Chilmark*, 380 Mass. 246, 253 (1980). See also *Collura* v. *Arlington, supra*.