ALFRED J. EMOND & others[1] vs. BOARD OF APPEALS OF
UXBRIDGE & another.[2]

No. 88-P-133.

Worcester. November 14, 1988. — July 28, 1989.

Present: GREANEY, C.J., KAPLAN, & ARMSTRONG, JJ.

*Zoning*, Special permit, Validity of by-law or ordinance, Dimensional re-
quirements. *Uxbridge*.

Section X of the Uxbridge zoning by-law, which fixes dimensional require-
ments for various zoning districts and which authorizes the board of
appeals to grant special permits for lots with less area or less frontage
than prescribed in the by-law, did not vest unlimited discretion in the
board to deviate from the requirements of the by-law in violation of the
uniformity requirement of the Zoning Act set forth in G. L. c. 40A, § 4
[631-632], nor was the section invalid on the ground that the special
permit provisions of the Zoning Act, G. L. c. 40A, § 9, do not authorize
the granting of such permits for dimensional variations [632-636].

CIVIL ACTION commenced in the Superior Court Department
on June 3, 1987.

The case was heard by *William C. O'Neil, Jr.*, J.

*Henry J. Lane* (*Richard R. Hubbard* with him) for Timothy
R. Potter.

*Mark I. Zarrow*, for the plaintiffs, submitted a brief.

ARMSTRONG, J. Abutters brought this action to challenge a
decision of the board of appeals of Uxbridge granting one
Potter a special permit for home construction on a lot containing
1.44 acres and having 125 feet of frontage. The standard area
and frontage requirements for the zoning district are one acre
and 200 feet. The special permit was granted under a section
of the Uxbridge zoning by-law, § X, fixing dimensional re-

---

[1] Dorothy M. Emond, Darrel E. Green, and Diane Green.

[2] Timothy R. Potter.

quirements for the various zoning districts, and authorizing the board to grant special permits for lots with less area or less frontage than those prescribed in the by-law,

> ". . . wherever, after a public hearing, it shall find that adjoining areas have been previously developed by the construction of buildings or structures on lots generally smaller than is prescribed by this section and the standard of the neighborhood so established does not reasonably require a subdivision of the applicant's land into lots as large as is hereby prescribed."

The abutters appeal from a judgment sustaining the special permit, arguing that the special permit portion of § X is invalid.

Section X is an effort by a town to adjust the impact of higher, district-wide dimensional requirements on neighborhoods previously settled in patterns of development reflecting more lenient frontage and area standards in effect at an earlier period.[3] No question is raised in this appeal as to the correctness of the board's and the judge's findings that Potter's lot meets the technical prerequisites for a special permit under section X. Rather, the plaintiff's two-pronged argument is that (1) section X is invalid because it gives the board unbridled discretion to deviate from the dimensional requirements of the zoning by-law; and (2) the special permit section of the Zoning Act, G. L. c. 40A, § 9, authorizes such permits only for use variations, not for dimensional variations, and what the board had done in this case is, in essence, a grant of a frontage variance.

The first point is, we think, without merit. The by-law does not give the board unlimited discretion. It only authorizes a deviation from the area or frontage requirements of the by-law in neighborhoods where there is a general pattern of house lots that deviate similarly from newly adopted, higher zoning stand-

---

[3] General Laws c. 40A, § 6, fourth par., as amended by St. 1979, c. 106, offers "grandfather" protection for unbuilt lots in certain situations, one of which the board originally found applicable here. Neither the board's second decision (on remand) nor the judge's decision relied on § 6, and Potter does not now claim it to be applicable.

ards. Implicit is a requirement that the reduced area and frontage authorized by the special permit not be less than those in general use. Certainly a zoning scheme properly takes account of "the nature and use of adjoining land and other land in the general vicinity," *Barney & Carey Co.* v. *Milton*, 324 Mass. 440, 449 (1949), and it is not unreasonable for a zoning by-law to adjust the impact of broadly drawn standards in neighborhoods where their enforcement would exceed what is necessary to preserve the character of, and protect property values in, the neighborhood. These broad purposes of zoning are not normally frustrated by uses wholly in character with the general pattern of development in the neighborhood and conforming to the dimensional standards previously and generally employed. Adjustments to conform zoning standards to the circumstances of particular fact situations need not, we think, be made exclusively by establishing zoning districts on a neighborhood by neighborhood basis. Authorizing adjustments by special permit, subject to clear and uniform standards, does not violate the uniformity requirement of G. L. c. 40A, § 4. *Haynes* v. *Grasso*, 353 Mass. 731, 734 (1968). *Harrison* v. *Braintree*, 355 Mass. 651, 655-656 (1969). *Shea* v. *Danvers*, 21 Mass. App. Ct. 996, 998 (1986). Section X of the Uxbridge zoning by-law vests in the board far narrower discretion than the by-law considered in *SCIT, Inc.* v. *Planning Bd. of Braintree*, 19 Mass. App. Ct. 101 (1984), which established a zoning district in which no uses were permitted as of right and any use required a special permit. There is nothing in section X which violates what the *SCIT, Inc.* opinion described as "[t]he basic assumption underlying the division of a municipality into zoning districts [, namely] that . . . each land use will have a predictable character and that the uses of land can be sorted out into compatible groupings." 19 Mass. App. Ct. at 107.

The more substantial objection is the second: whether the special permit mechanism must necessarily be limited to types of uses as contrasted with dimensional requirements. General Laws c. 40A, § 9, as appearing in St. 1975, c. 808, § 3, generally authorizes special permits "for specific types of uses which shall only be permitted in specified districts . . . . Special

permits may be issued only for uses which are in harmony with the general purposes and intent of the ordinance or by-law, and shall be subject to general or specific provisions set forth therein . . . ."

The language of § 9 gives little guidance as to whether the word "uses" is employed to distinguish "use" deviations from dimensional deviations, or whether it is employed in its more general signification. To explain: a dimensional requirement in effect says that a lot not meeting a dimensional standard may not be *used* for a particular purpose. An exception may be viewed as altering the dimensional standard or as altering the use to which a lot not meeting the dimensional standard may be put. Thus, we must look to the context and to the legislative history of § 9 to determine whether the Legislature intended the word "uses" in the broader or narrower sense. Compare *Bellows Farms, Inc.* v. *Building Inspector of Acton*, 364 Mass. 253, 258-259 (1973) (looking to the titles of amendatory acts for guidance in interpreting the word "use" in G. L. c. 40A, § 7A, as amended by St. 1963, c. 578). Contrast G. L. c. 40A, § 10, as appearing in St. 1975, c. 808, § 3 ("Except where local ordinances or by-laws shall expressly permit variances for use, no variance may authorize a use or activity not otherwise permitted in the district . . . ."), where it is clear from the context that the Legislature is alluding to the distinction between use variances and dimensional variances.

The pertinent language of § 9 was adopted as part of the new Zoning Act, St. 1975, c. 808, § 3. The special permit section (G. L. c. 40A, § 4) of the prior Zoning Enabling Act (inserted by St. 1954, c. 368, § 2) was not marred by the ambiguity of its 1975 counterpart. It provided that "[a] zoning ordinance or by-law may provide that exceptions may be allowed to the regulations and restrictions contained therein . . . . Such exceptions shall be in harmony with the general purpose and intent of the ordinance or by-law . . . ." Under this language it was held that a zoning by-law might properly provide for special permits authorizing deviations from dimensional standards subject to stated criteria. *Woods* v. *Newton*, 351 Mass. 98, 102-103 (1966). *Haynes* v. *Grasso*, 353 Mass. at 734.

*Adams* v. *Board of Appeals of Concord*, 356 Mass. 709, 711-712 (1970). The pivotal question is whether the Legislature, when it adopted in 1975 the revised, ambiguous formulation of the special permit section, intended to restrict the scope of special permits so that they could no longer be used, as they had previously, for fine-tuning dimensional standards in particular situations.

The legislative history of § 9 is reasonably revealing in this regard. Like the 1975 Zoning Act as a whole, it traces its origin to the Report of the Department of Community Affairs *Relative to Proposed Changes and Additions to the Zoning Enabling Act*, 1972 House Doc. No. 5009. The report proposed revising the language of § 4 of the 1954 Zoning Enabling Act so as to establish several categories of special permits, the first of which (and the relevant one for purposes of this case) would "encompass[ ] the traditional type of special permit currently in use except that it would abandon the term 'exception', which many authorities have regarded as a misnomer since no exception is typically involved in permitting such a use. Rather, the special permit is granted only for uses *specifically* authorized by the ordinance where it is appropriate to 'condition' the use or control its density or location" (emphasis original). 1972 House Doc. No. 5009, at 31. The specific language the report proposed read as follows:

> "Section 5. Special Permits. The zoning ordinance or by-law may specify the following types of development for which a special permit shall be required:
>
> (1) uses of a specified character permitted in all districts of a particular class. Such uses by special permit shall be in harmony with the general purpose and intent of the ordinance or by-law and shall be subject to general or specific rules and conditions therein contained. . . ."

The 1972 report was the source of the "uses" language which stayed with the legislation, without meaningful modification,

in its successive drafts,[4] up to the enactment in 1975 of the present Zoning Act. It seems clear that the draftsman, despite the "uses" language, intended by paragraph (1) to carry forward the scope of the special permit as it existed under the 1954 Zoning Enabling Act[5] and that his principal concern in proposing the paragraph (1) revision was to eliminate the "exception" language employed in the 1954 act. His reference to density control tends to suggest that he did not regard his draft as being inconsistent with the use of the special permit mechanism in connection with dimensional variations.

We find nothing in the legislative history (as outlined in note 4 *supra*) that suggests an intent to curtail the scope of special permits as authorized previously. Contemporary commentary on the 1975 Zoning Act suggests the opposite: "The scope of special permits is expanded substantially . . . ." Bok and White, The New Zoning Act, 20 B.B.J. (No. 2) 11, 12 (1976).[6]

---

[4] The report was referred to the Joint Committee on Urban Affairs for recess study (1972 House Doc. No. 6001). The following year two other bills, 1973 Senate Doc. No. 1439 and the Department of Community Affairs' 1973 report (1973 House Doc. No. 6200), carried special permit language identical to that used in the 1972 draft. These were referred to the committee, which, in its "First Interim Report . . . Relative to Changes in the Zoning Enabling Act," 1973 House Doc. No. 7227, still used the language set out in the text. The bill was recommitted (1973 House Doc. No. 7486). The joint committee submitted a "third interim report" as 1974 House Doc. No. 2522, which became a basis in part of 1974 House Doc. No. 5864, which was replaced in third reading with 1974 House Doc. No. 6480. The special permit sections of the last two bills contain for the first time the precise form of language (with one immaterial difference) that was adopted in the 1975 act as G. L. c. 40A, § 9, first par. (The 1974 legislative session ended without action on No. 6480. It was put before the 1975 session as 1975 House Doc. No. 525, which became a basis in part of 1975 House Doc. No. 5457, and finally 1975 House Doc. No. 5600.)

[5] Other paragraphs represented innovative uses for special permits which are reflected in the second, third, and fourth paragraphs of G. L. c. 40A, § 9, as adopted in 1975. These include such concepts as cluster development, multi-family residential uses in nonresidential districts, and density concessions where a developer is willing to make provision for public-interest amenities, such as open space, low or moderate income housing, or specific traffic or pedestrian improvements.

[6] The authors of this article, Mr. John Bok and Mr. James B. White, were chairmen of the Land Use Committee of the Boston Bar Association

Our cases have not read the 1975 Act as having curtailed the traditional uses of special permits. Thus, in *SCIT, Inc.* v. *Planning Bd. of Braintree*, we stated: "Section 9 of [c.] 40A preserves the traditional outlines of the special permit power discussed above and provides for the use of special permits in certain new ways." 19 Mass. App. Ct. at 109. More generally, it has been observed that "[t]he stated, permissible purposes of zoning under the 1975 Zoning Act (St. 1975, c. 808, § 2A) are broader than those expressed in the 1954 Zoning Enabling Act (St. 1954, c. 368, § 2)." *Sturges* v. *Chilmark*, 380 Mass. 246, 253 n.11 (1980).

We are reluctant at this late date, fourteen years after passage of the new act, to find in the ambiguous language of the first paragraph of § 9 a significant restriction on the historic use of the special permit power, a restriction that, so far as we can ascertain, has not hitherto been noticed in scholarly commentary or in the decisional law, and one which would introduce a new rigidity into municipal land-use control of a type that serves no appropriate zoning purposes. We hold, therefore, that the special permit provision of § X of the Uxbridge zoning by-law is not in conflict with § 9 of the Zoning Act.

*Judgment affirmed.*

---

in 1974 and 1975. That committee "provid[ed] some degree of drafting assistance to . . . the [Legislature's] Urban Affairs Committee" in the latter stages of the bill's progression towards passage. Bok and White, *supra* at 11-12.