ASD THREE RIVERS MA SOLAR, LLC vs. THE PLANNING BOARD OF THE TOWN OF WILBRAHAM, MISC 19-000089

































 
 ASD THREE RIVERS MA SOLAR, LLC, Plaintiff, v. THE PLANNING BOARD OF THE TOWN OF WILBRAHAM, and JEFFREY A. SMITH, TRACEY PLANTIER, JOHN McCLOSKEY, JAMES E. MOORE, JR., JAMES ROONEY, and GORDON ALLEN, as they are the Members and Associate Members of the Planning Board of the Town of Wilbraham, Defendants
 MISC 19-000089 
 APRIL 5, 2021
HAMPDEN, ss.
RUBIN, J.
DECISION














 The Plaintiff, ASD Three Rivers MA Solar, LLC ("Three Rivers"), challenges a decision (the "Decision") by Defendants, the members of the Planning Board of the Town of Wilbraham (the "Board"), denying Three Rivers' application for a special permit to install and operate a large-scale, ground-mounted solar energy system (the "SES") with associated site improvements (collectively, the "Project") on 21.7 acres of land owned by Gilmar Realty, LLC located at 285 Three Rivers Road in Wilbraham (the "Property"). Three Rivers' Complaint includes two counts: Count I challenging the Decision under G. L. c. 40A, § 17 as "unreasonable, arbitrary, capricious, not based upon evidence, and in excess of the Board's authority," and Count II challenging the Decision under G. L. c. 40A, § 3 as amounting to a "prohibition or an unreasonable regulation of the installation of solar energy systems." 





 For the reasons discussed below, I find that each of the Board's reasons for denial of Three Rivers' special permit application as set out in the Notice of Decision is wholly unsubstantiated and does not support denial of the special permit. I further find that the denial unreasonably regulates the installation of solar energy facilities in contravention of § 3 of Chapter 40A, as discussed in Section III below. Accordingly, the Board's Decision must be annulled and the special permit will be ordered to be issued. 





PROCEDURAL BACKGROUND 





 The Board issued its Decision on January 30, 2019, and Three Rivers timely appealed by filing a complaint in this court on February 19, 2019. On September 15, 2020, after discovery was complete and a pre-trial conference had been scheduled, the Board filed a Motion for Leave of Court to File Motion for Summary Judgment. After hearing on September 16, 2020, during the Pre-Trial Conference, the court (Rubin, J.) denied that motion to promote judicial economy and fairness since trial had been scheduled to commence on September 29, 2020, and Three Rivers explained that delay would be prejudicial in light of upcoming deadlines to secure financing of its proposed solar project. Further, there appeared to be material factual issues in dispute precluding the court's resolution of this case on a motion for summary judgment. Also at the pre-trial conference on September 16, 2020, the parties agreed that two issues would proceed to trial: (1) Whether the Decision was based on legally untenable grounds, or was unreasonable, whimsical, capricious or arbitrary; and (2) Whether the Decision amounted to a prohibition or an unreasonable regulation of the installation of solar energy systems.





 Trial proceeded on September 29 and 30, 2020. I took a view of the Property on October 1, 2020, following trial. After receipt of transcripts and the filing of post-trial memoranda, I took this matter under advisement. 





FINDINGS OF FACT 





 Based on the facts stipulated by the parties, the documentary and testimonial evidence admitted at trial, my view of the Property, and my assessment as the trier of fact of the credibility, weight and inferences reasonably to be drawn from the evidence admitted at trial, I make factual findings as follows: 





The Plaintiff 





1. Plaintiff ASD Three Rivers MA Solar LLC is a Delaware limited liability company with a principal address of 1550 Wewatta Street, 4th Floor, Denver, CO 80202. Tr. Ex. 1. AMP Solar Development Inc. ("AMP"), Three Rivers' parent company, is a global owner, operator, and developer of renewable energy projects. Tr. Vol. I, at 23. AMP organized Three Rivers as a special-purpose entity for the Project, such that Three Rivers would hold all of the project-specific documents and transactions, have site control, hold the permit for the Project, and conduct all the related sale of electricity and assets for the Project. Tr. Vol. I, at 101, 25. 





The Proposed Project, Site and the Neighborhood 





2. Three Rivers is the prospective purchaser of the Property pursuant to a Purchase Option Agreement between Gilmar Realty, LLC, and Three Rivers, dated January 12, 2018. Statement of Agreed Facts by both parties, filed with their Joint Pre-Trial Memorandum, on August 27, 2020 ("SOF"), ¶ 6.





3. The Property is a 21.7-acre undeveloped, wooded parcel located at Map 1145, Block 92, Lot 5910 a/k/a 285 Three Rivers Road in Wilbraham, which is located in the Town's Residence 60 ("R-60") zoning district. Tr. Ex. 1, at 2-1. 





4. Trees and thick underbrush cover the Property. Aside from an entrance path off of Three Rivers Road, there are no defined paths within the Property at present, although the court observed an abandoned truck, a tree stand for hunting, and occasional garbage on the Property. An area of wetlands was also visible in the northern portion of the Property. 





5. The Property slopes alternately uphill and downhill but remains essentially level across the site. During the view, while circumnavigating the perimeter of the Property along a bushwhacked path (about 50 feet from the boundary in the location of a proposed fence and berm), only occasional glimpses of houses were visible and in almost all case only the roofs of houses against the sky. 





6. The area surrounding the Property is a suburban neighborhood, featuring well-spaced, single family homes with groomed lawns. Three Rivers Road is a two-lane road which abuts the Property on its western boundary. Residential abutters are located across Three Rivers Road and around all sides of the Project site. The Property's eastern boundary is also the town line between the Town of Wilbraham and the Town of Palmer. 





The Solar Bylaw 





7. The Wilbraham Zoning Bylaw ("Bylaw") specifically provides for the installation of Large Scale Ground-Mounted Solar Energy Systems ("SES" or "SES Projects"), in Section 10.7, entitled "Large Scale Ground-Mounted Solar Energy Systems" (the "Solar Bylaw"). 





8. SES are defined in Section 1.3, to include: 





 A solar energy system with solar panels structurally mounted on the ground in an array that occupies a total footprint area greater than 10,000 square feet of land, said footprint being measured as the total area of the vertical projection on the ground of all panels in the installation's most horizontal tilt position including all spaces between the panels. 





9. Schedule of Use Restrictions. The Bylaw, at Section 10.7.7 identifies districts where SES Projects may be constructed in the Schedule of Use Restrictions, Table One. Table One utilizes the "PB" code to permit SES projects in the R-60 District (as well as several other residential districts) by special permit. More specifically: "PB" means: "Use allowed by Special Permit in the district indicated if granted by the Planning Board subject to the [special permit] provisions of Section 13.6 and furthermore subject to such requirements as may be specified elsewhere in this By-law." Section 3.4.3.7 of Table One also provides that SES projects are "Subject to the restrictions in Section 10.7." Ex. 2, Section 3.4.3.7 





10. Special Permit Requirements. Section 13.6.5 of the Bylaw lists eleven Required Findings, "when applicable," in order for the Board to grant a special permit: 





 13.6.5.1 The proposed use is in harmony with the general purpose and intent of this By-Law. 





 13.6.5.2 The proposed use is suitably located in the neighborhood in which it is proposed and/or the entire Town. 





 13.6.5.3 The proposed use is reasonably compatible with the character and scale of other uses permitted in the same district. 





 13.6.5.4 The proposed use will not constitute a nuisance due to air and water pollution, excessive noise, dust, vibration, lights, or visually offensive structures and accessories. 





 13.6.5.5 The proposed use provides convenient and safe vehicular and pedestrian movement within the site and in relation to adjacent streets, property or improvements, and will not create a significant traffic hazard or result in excessive traffic congestion. 





 13.6.5.6 Adequate and appropriate facilities will be provided for the proper operation of the proposed use.





 13.6.5.7 The proposal will be in conformance with the sign regulation of Section 12; 





 13.6.5.8 The proposal conforms to the off-street parking and loading requirements of Section 11 and provides adequate space for off-street parking and unloading of vehicles; 





 13.6.5.9 The design of the project provides for adequate methods of disposal and/or storage of sewage, refuse and other wastes generated by the proposed uses on the site; 





 13.6.5.10 The design of the project provides for adequate surface water drainage and the proposed use will not create a significant adverse impact to the quality of surface water or groundwater during or after construction; 





 13.6.5.11 The proposed use complies with all other additional special permit criteria or zoning requirements imposed on the use by other sections of this By Law. 





11. The Solar Bylaw. Section 10.7 of the Bylaw encompasses more than seven pages, includes a purpose section and covers such topics as general requirements, filing requirements, design and performance standards, technical review and decommissioning and abandonment, among others. Section 10.7.1 provides: 





 "The purpose of this section of the Zoning By-law is to promote and facilitate the orderly development of Large-Scale Ground-Mounted Solar Energy Systems in the Town of Wilbraham by providing standards for the placement, design, construction, operation , monitoring , modification and removal of such systems, to protect public safety, to minimize impacts on scenic, natural and historic community resources, and to provide adequate financial assurance for the eventual decommissioning of such systems." 





12. Section 10.7.7 sets forth fifteen Design Requirements and Performance Standards for Large Scale Ground-Mounted Solar Energy Systems, each with its own caption, as follows: 





 A. Lot Size. "The minimum lot size...shall be five (5) acres." 





 B. Setbacks. SES projects "shall maintain a minimum front yard setback distance of 75 feet and a minimum side yard and rear yard setback distance of 50 feet..." 





 C. Height. "The height of the solar panels...shall not exceed fifteen (15) feet in height above finished grade."





 D. Appurtenant Structures. "All appurtenant structures...shall be architecturally compatible with each other and subject to reasonable regulations concerning the bulk and height of such structures, setbacks, parking, and building coverage requirements." 





 E. Lighting. "Lighting shall be limited to that required for safety and operational purposes shall be reasonably shielded so as not to be intrusive to abutting properties. Lighting shall be directed downward and shall incorporate full cut-off fixtures to reduce light pollution." 





 F. Screening. "Whenever reasonable and practical, [SES projects] shall be screened year-round from all adjoining properties in residential use and public and private ways..." 





 G. Vegetation Clearing. "The clearing of vegetation shall be limited to that which is necessary for the construction, operation, maintenance, modification and removal of the [SES project]." 





 H. Habitat Fragmentation. "...The facility shall be designed to minimize impacts to agricultural and environmentally sensitive land and to be compatible with continued agricultural use of the land whenever possible." 





 I. Signs. "Signs shall comply with section 12 of the [Bylaw]. A sign consistent with Wilbraham's sign regulations shall be required to identify the owner and provide a 24-hour emergency contact phone number." 





 J. Noise. "Noise generated by [SES projects] and associated equipment and machinery shall conform to applicable state and local noise regulations, including the Massachusetts DEP's Division of Air Quality noise regulations, 310 CMR 7.10." 





 K. Utility Connections. "All utility connections from [SES projects] to existing overhead utilities shall be underground..." 





 L. Stormwater management. "Best management practices shall be used for controlling and managing stormwater run-off and drainage... in compliance with all applicable federal, state and local regulations." 





 M. Security Measures. "[SES projects] shall be constructed to prevent unauthorized persons from accessing the [SES project]." 





 N. Emergency Access. "[SES projects] and access roads shall be constructed and maintained to allow for safe access by local emergency vehicles. Access roads shall be constructed to minimize grading, removal of stone walls or street trees and to minimize impacts to environmental or historic resources."





 O. Emergency Response Plan. "Upon the request of the fire chief, the owner/operator of the Large-Scale Ground-Mounted Solar Energy System shall cooperate with all local public safety officials to develop and occasionally update an emergency response plan." 





13. In October 2019, the Town adopted modifications to the Solar Bylaw, in part as a result of Three Rivers' Application. Among other changes, the 2019 Bylaw includes a new Section 10.7.6 (F), entitled "Lot Coverage," as follows: 





 "The maximum lot coverage for [SES] shall be twenty-five percent (25%) when located in residential zoning districts and fifty percent (50%) when located in commercial or industrial (non-residential) zoning districts. For the purposes of this section, lot coverage shall be measured as the total aggregate area of land covered by buildings, structures, associated equipment including solar panels and all land contained within the perimeter security fence and calculated as a percentage of the total area of the lot. Tr. Vol. I, at 254-256; Tr. Ex. 22. 





The Project and the Application 





14. AMP retained Aries Power Systems ("Aries"), and its sole proprietor James Evan Turner ("Turner"), to identify sites for solar power projects in Massachusetts and to bring them through the development process. Tr. Vol. I, at 99-100. Before Three Rivers filed its application for a special permit, in approximately July or August of 2018, Turner met with the Board to discuss the proposed project. Tr. Vol. I, at 203. 





15. Three Rivers filed its Application for Special Permit/Site Plan Review on August 27, 2018 (the "Application") to install an up to 7.6-megawatt SES on a 21.7-acre parcel, with a maximum height of 9 feet. The solar array component of the Project would occupy 9.2 acres. At that time, applications for two other SES projects were pending in Town, at Beebe Road and Tinkham Road. SOF, ¶ 9; Tr. Vol. 1, at 203-204; Tr. Ex. 1 





16. Upon filing, the Application was sent to the Town's Department of Public Works ("DPW") for review, as well as other departments. At that time John Pearsall was Planning Director for the Town ("Pearsall") and Ed Miga was the Director of the DPW ("Miga" or "Town Engineer"). Miga prepared a memorandum to Pearsall, dated October 4, 2108, evaluating the Application and identifying five areas for follow up. Miga sent a further memorandum to Pearsall on November 7, 2018, after reviewing Three Rivers' revised plans dated November 1, 2018. Tr. Vol I, at 207-209; Tr. Exs. 9, 10. 





17. The Application proposed visual screening of the SES from abutting properties utilizing three methods: retaining the woodland as a natural vegetative border around the solar installation, extensive supplemental landscaping with both evergreen bushes and trees, and installation of a wooden fence around the perimeter of the SES inside of a woodlands buffer area. SOF, ¶¶ 7-10. 





18. Before the first session of the public hearing on October 10, 2018, in response to requests from Pearsall and the Conservation Commission, Three Rivers submitted supplemental landscaping plans showing new and varied trees and shrub plantings for additional screening in addition to retention of the natural woodland in a fifty-foot buffer area, as well as a noise study report and revisions to the stormwater detention plan. Tr. Vol. I, at 36-38: Tr. Ex. 5. 





19. At the first session of the public hearing, the Board, and members of the public raised concerns about the size and visual impact of the proposed Project. As a result, the hearing was continued to October 24, 2018. The Board requested that Three Rivers perform a focused viewshed analysis to address the visual impact of the proposed Project from the vantage point of a single abutting residential property that was located across Three Rivers Road from the Project (the Swist property at 270 Three Rivers Road). SOF, ¶¶ 11-12; Tr. Exs. 25, 26. 





20. Before the second session, Three Rivers submitted additional materials to the Board, with revised plans and a wildlife habitat evaluation report. The revised plans showed a reduced footprint for the solar array component of the proposed Project (by 10 to 12 percent), as well as increased setbacks (from 50 feet to 85 and 100 feet. SOF, ¶ 13; Tr. Vol. I, at 40-43, 52, 129-136; Tr. Exs. 6, 7. 





21. On October 24, 2018, the Board conducted a site walk of the Property, and then held a second session of the public hearing. Several neighbors appeared and expressed concerns about the proposed Project and suggested that there would be a "chilling effect" on home sales in the area and raised a concern about view impacts. As a result, the hearing was further continued until November 14, 2018. SOF, ¶¶ 12 -14. 





22. On November 5, before the third session, Three Rivers submitted further revised plans to the Board, as well as a Line of Sight Diagram prepared by TRC, Three Rivers' energy consultants, using aerial radar to show how much of the solar array would be visible from a second floor window of the Swist home. At trial, Turner and Lawrence Cook ("Cook"), another member of the Three Rivers' team, explained the Line of Sight Diagram and methodology, which showed that conservatively no more than five to ten percent of the array would be visible from that vantage point. The visible portion was that located at the highest point of the array and the point furthest from the Swift home, more than one thousand three hundred feet away from the house. Based on the Line of Sight Diagram and my observations during the view, I conclude the visual impact of the Project would be de minimis as isolated to this single house ( and only from its second-floor windows). Tr. Vol. I, at 52-59, 171; Tr. Ex. 8. 





23. The November 5, 2018, revisions incorporated a nine to ten-foot-high wooden fence atop a two-foot-high berm to screen the visual impacts of direct abutters as they looked out of their backyards toward the woodland and SES. These further revised plans showed a greater reduction in the footprint for the solar array component of the SES by about 25 percent from the original plan, further increased the setbacks and reduced the number of solar panels. The final combination of screening included a buffer of existing woodlands ranging between 100 feet at the eastern and northern boundaries and 150 feet at the southern boundary, then a berm with wooden fence (with breaks in it so that wildlife could travel), then supplemental plantings, then a security fence. SOF, ¶ 16; Tr. Vol. 1, 59-62, 70, 133-138; Tr. Ex. 8, 26. 





24. On November 14, 2018, the Board held a third session of the public hearing. The Decision notes that at the end of the session on November 14, 2018, the public hearing was closed "[w]ith the consent of the Applicant." 





25. As of November 14, 2108, the revised Project resulted in clearing of 16.7 acres (or 77 percent of the 21.7-acre woodland site), with a solar array with a total footprint of approximately 10.4 acres (or 48 percent of the site) and 5 acres of woodland. Tr. Ex. 3, ¶ 13. 





26. On or about January 30, 2019, the Board voted unanimously (5-0) to deny the Application. On January 31, 2019, the Board filed its Decision denying the Application. SOF, ¶ 20; Tr. Ex. 3, ¶ 11. 





27. In the Decision, the Board found the proposed Project met all of the Design Requirements and Performance Standards under section 10.7.7 of the Bylaw. More specifically, the proposed Project satisfied each of the following standards: minimum lot size in Section 10.7.7(A), setbacks in Section 10.7.7(B), height limits in Section 10.7.7(C), appurtenant structures in Section 10.7.7 (D), lighting in Section 10.7.7 (E) (none was proposed), screening in Section 10.7.7 (F), vegetative clearing in Section 10.7.7 (G), habitat fragmentation in Section 10.7.7 (H), sign in Section 10.7.7. (I), noise in Section 10.7.7 (J), utility connections in Section 10.7.7 (K), stormwater management in Section 10.7.7 (L), security measures in Section 10.7.7 (M), emergency access in Section 10.7.7 (N), and emergency response plan in Section 10.7.7 (O). Tr. Vol. I, at 69-73, 231; Tr. Ex. 3, ¶ 11. 





28. The Decision provided several reasons for denying the Application, as follows: 





 "The submitted design of the proposed use will result in a solar array with a total footprint area of approximately 10.4 acres which represents approximately 48 percent of the total area of the subject property and which would significantly exceed the maximum building coverage requirement of 25 percent in the [R-60] Zoning District imposed under section 4.4.8..." Tr. Ex. 3, ¶ 13. 





 "The size, scale and proximity of the proposed use will create a significant negative visual impact of the abutting residential neighborhood. Measures offered by [Three Rivers] to screen the proposed use from the view of abutting homes with fencing and landscaping would be inadequate and ineffective taking into consideration the large amount forest land to be cleared and the excessive lot coverage needed to accommodate the design of the proposed commercial solar array, the topography of the subject property and abutting land, and the close proximity of adjacent homes to the proposed use." Tr. Ex. 3, ¶ 15. 





 "The subject property is not an appropriate site for the proposed use. The size and scale of the proposed use is excessive and will overburden the subject property. The proximity of the proposed use has the potential to negatively impact the abutters use and enjoyment of their homes and harm their property values. At the public hearing the Planning Board heard credible verbal testimony from abutting property owners and the opinion of local real estate professionals that the proposed commercial solar use has had a chilling effect on existing home sales and, if constructed, will result in reduced property values for homes in the surrounding neighborhood. While the Applicant's representative was unaware of any published data to either support or refute these claims, he did provide anecdotal evidence in support of the claims by stating that some communities have used PILOT money generated from commercial solar projects as a form of monetary compensation to abutting property owners." Tr. Ex. 3, ¶ 16. 





 "For the reasons listed herein, the size, scale and character of the proposed use is not in harmony with the general purpose and intent of the Zoning Bylaw and therefore does not meet the required finding for granting a Special Permit imposed under section 13.6.5.1 of the Wilbraham Zoning By-Law." Tr. Ex. 3, ¶ 17. 





 "For the reasons listed herein, the size, scale and character of the proposed use is not suitably located in the neighborhood in which it is proposed and therefore does not meet the required finding for granting a Special Permit imposed under 13.6.5.2 of the Wilbraham Zoning By Law." Tr. Ex. 3, ¶ 18. 





 "For the reasons listed herein, the size, scale and character of the proposed use is not compatible with the character and scale of other similar uses permitted in the same district and therefore does not meet the required finding for granting a Special Permit imposed under section 13.6.5.3 of the Wilbraham Zoning By-Law." Tr. Ex. 3, ¶ 19. 





 "For the reasons listed herein, the size, scale and character of the proposed use will constitute a nuisance as a visually offensive structure and therefore does not meet the required finding for granting a Special Permit imposed under section 13.6.5.4 of the Wilbraham Zoning By Law." Tr. Ex. 3, ¶ 20. 





Maximum Building Coverage As Applied to SES Projects Before the Decision 





29. As noted above, one of the reasons for the Board's denial was that the total footprint area of the proposed Project would cover approximately 48% of the total area of the Property and this percentage would "significantly exceed the maximum building coverage requirement of 25 percent in the [R-60] Zoning District imposed under section 4.4.8." SOF, ¶ 22. 





30. Section 4 of the Bylaw, entitled "Single Dwelling Residence Districts," governs the various residential districts in Town, including the R-60 District where the Project site is located. For any "building or structure" in those districts, Section 4 sets forth general requirements and dimensional regulations. Tr. Ex. 2. 





31. Section 4 contains no reference to solar energy systems. Likewise, Section 10.7 (the Solar Bylaw), which governs SES Projects and is entitled "Large-Scale Ground-Mounted Solar Energy Systems," makes no reference to Section 4 or the maximum building coverage. 





32. Subsection 4.4.4 is entitled "Maximum Building Coverage" and provides: "The total aggregate lot area covered by all principal and accessory buildings and structures shall not exceed the percentage specified in the applicable residence district, as listed in the schedule in Section 4.4.10". Tr. Ex. 2. Pearsall testified that he considered "Maximum Building Coverage" to be the same thing as "maximum lot coverage." Tr. Vol. I, at 233-234. 





33. Section 4.4.10 is a Schedule of Dimensional Requirements, providing dimensional requirements for each of the residential districts. According to this Schedule, in the R-60 zoning district, the Maximum Building Coverage shall not exceed 25 percent for any parcel. Tr. Ex. 2. 





34. During initial introductory and planning meetings with the Town over approximately two months leading up to Three Rivers' filing its Application, at no time did any representative of the Town mention a requirement regarding Maximum Building Coverage to Turner or any other representative of Three Rivers. During three sessions of the public hearing and the site walk, although the Board requested numerous "homework" assignments of Three Rivers for additional studies during the application process, at no point did the Board request a building coverage calculation. Tr. Vol. I, at 105-6, 111-119, 129, 145, 234. 





35. The Town did not disclose the proposed Project's nonconformance with a Maximum Building Coverage requirement when providing feedback to Three Rivers between sessions of the public hearing, nor did it disclose such nonconformance as a reason for concern about the Application at any point prior to issuing the Decision. Tr. Vol. I, at 234, 236. 





36. Neither of Miga's two engineering memoranda to Pearsall mentioned any need to calculate Maximum Building Coverage under Section 4 of the By-Law. Pearsall confirmed during his testimony that Three Rivers had satisfactorily addressed Miga's various comments and requests. Tr. Vol I, at 220; Tr. Exs. 9, 10. 





37. At no time during any of the three sessions of the public hearing or during the site visit did any member of the Board of representative of the Town mention or alert Three Rivers that Maximum Building Coverage was a factor in their approval process for special permits for SES. Tr. Vol. I, at 39-40.





38. At no time prior to the issuance of the Decision did the Board ever discuss or inform Three Rivers that the Project exceeded the 25 percent Maximum Building Voverage requirement in Section 4 of the Bylaw. Tr. Vol. I, at 236. 





39. Prior to issuing the Decision, the Board had granted special permits to two other applicants to construct SES' at locations on Main Street and Beebe Road [Note 1], on September 16, 2015 and November 14, 2018, respectively. Both of these locations are within the Town's residential zoning districts. The Board did not consider Maximum Building Coverage when reviewing permit applications for either of those projects, nor did it apply such a requirement or any portion of Section 4 of the Bylaw to either project. This disparate treatment, among other factors, leads me to conclude the reasons given in Decision for denying Three Rivers' Application were a pretext. Tr. Vol. I, at 245-9; Tr. Vol. II, at 14-15; Tr. Exs. 11, 12. 





Maximum Building Coverage as Applied to the Three Rivers Project 





40. In October, 2018, between the first and third sessions of the public hearing for Three Rivers' Application, Pearsall was contacted by a real estate attorney (and former member of the Wilbraham Board of Appeals) by the name of H. Clark Abbott ("Abbott") who was considering representing several neighbors of the proposed Project adverse to Three Rivers. Abbott suggested to Pearsall that Three Rivers' proposed plans for the Project exceeded the Maximum Building Coverage. At the time Pearsall disagreed that Maximum Building Coverage applied to the Project. Pearsall testified: 





 "My response to him -- and it was a very quick reply -- is I said, I don't believe that would apply to this kind of use. Because building coverage has not come up a lot in Wilbraham. It's been very rarely invoked. It's always been in the context of somebody building a single family home in a residential area". Tr. Vol. I, at 242-3, 252. 





41. Pearsall never shared his conversation with Abbott with the Board because, "I just didn't think it was relevant to what we were reviewing." He only decided to share Abbott's interpretation with the Board when it became clear to Pearsall that there was a consensus of the Board to deny the Application. At that point, Pearsall looked to Section 4 of the Bylaw to see if that could be supporting or supplemental grounds for supporting the denial. Tr. Vol. I, at 224-245. Pearsall explained that Maximum Building Coverage was not the "primary" reason the Board decided to deny Three Rivers' Application, "because the ... Board wasn't even aware of it when they concluded that they wanted to deny the project." Tr. Vol. I, at 252-253. 





42. On November 14, 2018, after the third session of the public hearing for Three Rivers' Application, the Board held a preliminary meeting and passed a motion authorizing Pearsall to work with the board chairman to draft a decision to deny Three Rivers' Application with grounds for denial that would be taken up and considered at a future meeting. Tr. Vol. I, at 226-7. As Pearsall explained, the consensus of the Board members was that the Application should be denied principally based on the Project's size, scale, and visual impact. Tr. Vol. I, at 244-5. At trial, Pearsall further explained that the Board had to face a "conundrum" or "paradox" because: 





 "On the one hand the planning board members felt the applicant had done... a really good job of presenting materials to the Board. That they had been responsive to the Board's requests and had provided additional information. That the people that they had representing them before ethe board were considered excellent people who were very knowledgeable and, again, responded to the ... Board's questions. But so they felt that they done a great job on that hand. On the other hand, they felt that there were serious concerns that had been raised from the beginning of the application, and that there was a sort of a question of whether this was just an inappropriate site for this particular type of use." Tr. Vol. I, at 225-226.





43. Once charged with writing a denial decision, Pearsall recalled his previous conversation with Abbott and went back to look at the Maximum Building Coverage provision in Section 4 of the Bylaw. Pearsall concluded that the Project's nonconformance with Section 4's Maximum Building Coverage requirement could be "supporting or supplemental grounds" for the Board's denial of the Application. Tr. Vol. I, at 245. 





44. Shortly afterwards, Pearsall developed an initial method ("Method 1") for calculating the Maximum Building Coverage for SES Projects and instructed Miga and his staff in the Engineering Department to apply this method to the Project's final plans. [Note 2] Tr. Vol. II, at 22- 3; Tr. Vol. II, at 19-23. Miga calculated that the Maximum Building Coverage for the Project would be 48 percent, which exceeded Section 4's requirement that Maximum Building Coverage shall not exceed 25 percent for any parcel in the R-60 District. Tr. Vol. II, at 24. This figure of 48 percent was included as a ground for denial in the Board's Notice of Decision when it issued on January 30, 2019. Tr. Ex. 3. 





45. Pearsall testified that the Board met once or twice in open session to deliberate regarding the draft Decision denying the Application and whether to include the Maximum Building Coverage issue as a basis for the denial but did not inform Three Rivers. Tr. Vol. II at 17-18. 





46. Although the Board members and general public asked many questions about many different issues at the three sessions of the public hearing, none of the Board members or anyone else mentioned a Maximum Building Coverage requirement. At the close of the hearing, Three Rivers asked the Board whether there was any further information that they needed or if there was anything further Three Rivers could do and the response was "No." Tr. Vol. I, at 39-40, 54, 65-66. I credit this testimony because Pearsall testified that the Board had a lot of respect for the Project developers and their integrity and the level of detail they provided. When asked if he had previously stated that the proposed Project was a "nice project, but the wrong location," Pearsall replied, "Exactly." Tr. Vol. II, at 72. 





47. Another proposed SES on Tinkham Road was also under consideration at the same time as the Project. Tr. Vol. I, at 245 -247. On or about January 9, 2019, while the Decision was pending, the Board granted a special permit for the Tinkam Road project. During the public hearing process for Tinkham Road, the Board had not considered Maximum Building Coverage, but a finding related to Maximum Building Coverage was included in the Tinkham Road decision because Pearsall thought the Town "should be treating all of the projects the same." Tr. Ex. 13, at 8; Tr. Vol. I, at 248. 





48. I find that Pearsall never considered the application of Maximum Building Coverage to Large-Scale Ground-Mounted Solar Energy Systems prior to the conclusion of the public hearing for Three Rivers' Application. I find that the Board similarly did not consider the application of Maximum Building Coverage until Pearsall suggested it to the Board, which took place after the Board decided to deny Three Rivers' Application. 





Maximum Building Coverage as Applied to SES Projects After the Decision 





49. In the summer of 2019, Pearsall went back to review the previously approved Main Street and Beebe Road SES projects to see if they satisfied the Maximum Building Coverage provision in Section 4, using Method 1 and asked Miga also undertake those calculations. Miga determined that the Beebe Road project exceeded the Maximum Building Coverage using Method 1 with Maximum Building Coverage of 39 percent. Also during the summer of 2019, Pearsall devised a new method for calculating Maximum Building Coverage for SES, using only the area taken up by the footprint area of the solar panels row, the transformer pad and other structures and not the entire fenced-in-area ("Method 2"). 





50. Pearsall contacted Thomas Reidy ("Reidy"), the attorney who had represented the proponent of the Beebe Road project, BlueWave, to advise that its SES Project failed to comply with Method 1 for calculating Maximum Building Coverage. Pearsall was concerned that the Beebe Road project might be susceptible to an enforcement challenge and BlueWave might want to take steps to prove it was in compliance with the newly applied requirement. Pearsall suggested that BlueWave might consider recalculating the Maximum Building Coverage for its project by eliminating the row spacing between the solar panels, by using Method 2. Tr. Vol. II, at 24-31, 46. 





51. Reidy offered to have BlueWave's engineering consultant undertake the Method 2 calculation. On August 1, 2019, at the request of Reidy, Pearsall sent electronic copies of the plans for the Three Rivers' Project so that BlueWave's engineer could analyze whether there might be a distinction between the Beebe Road project and the Three Rivers' Project. In his email request, Reidy explained: 





 "Essentially, our calculation shows that we are under the 25% coverage requirements. Understanding that 3 Rivers project's row spacing were incredibly tight, we think there may be a distinction. With the plan, then we will be able to find out if that distinction does exist such that an interpretation of the bylaw could be had where we comply and 3 Rivers fails." Tr. Ex. 14. 





52. Pearsall conceded at trial that he did not know precisely how BlueWave calculated Maximum Building Coverage and had not sent an electronic CAD version of the Three Rivers' plans to Reidy, but rather sent PDF copies of the plans because that was all he had available. 





53. Using Method 2, BlueWave's engineers calculated that its system at Beebe Road did not exceed the Maximum Building Coverage limits of the Bylaw, and also calculated that the Three Rivers' Project, based on the PDF copies of the plans, would exceed the Maximum Building Coverage limits of Section 4. Tr. Vol. II, at 25-26, 37-8; Tr. Ex. 15, 18. In an email to Pearsall on August 5, 2019, Reidy shared these calculations, in a chart format. According to BlueWave's chart, the panel area for the Beebe Road project was 15 percent and the panel area for Three Rivers' Project was 31 percent. [Note 3] Tr. Ex. 15. The Town did not independently verify these calculations, advise Three Rivers of these calculations until discovery in this lawsuit in July of 2020, or provide Three Rivers with an opportunity to review either the Method 1 or Method 2 calculations. Tr. Vol. II, at 40-41. Pearsall testified, "I can't say whether they followed my instructions or not." Tr. Vol. II, at 32-36. 





54. Pearsall responded to Reidy in an email dated August 5, 2109. He stated: 





 "Assuming your calculations are based on the footprint area of the panels, transformer pad and other structures and the total coverage is less than 25% of the total lot area in Wilbraham, then you would be in compliance and would not need to request a waiver under the new regulations.... I would like to have a report prepared for the file to defend against possible challenges in the future." Tr. Vol. II, at 42-43;Tr. Ex. 16. 





55. Following up on Pearsall's request, on August 27, 2019, Reidy supplied a letter and plan stamped by BlueWave's engineer Kevin McCaffery of SWCA Environmental Consultants stating that the Beebe Road SES complied with the Maximum Building Coverage requirement in effect at the time its special permit. Tr. Vol. II, at 46-47; Tr. Exs. 17, 18. 





56. Also, in August of 2019, while communicating with Pearsall about the Maximum Building Coverage calculations for the Beebe Road project, Reidy also advised Pearsall that BlueWave would like to request Board approval for a modification to the Beebe Road layout. That change would densify the solar array by reducing the row spacing from twelve feet to eight feet and increasing building coverage on the site. In an email to Reidy, dated August 28, 2019, Pearsall gave instructions and advice to Reidy on how to perform the calculations for the modified solar array. Tr. Vol. II, at 49-51; Tr. Ex. 19. 





57. Reidy followed Pearsall's instructions and on October 3, 2019, submitted to Pearsall on behalf of the Board a formal request for administrative approval of a modification to the Beebe Road SES with a densified solar array, enclosing revised plans and calculations for building coverage in accordance with Pearsall's instructions. The Board approved those modified plans at a meeting and without a public hearing. According to Pearsall, a public hearing was not warranted because the request was just an amendment to an existing special permit. The Board's preferential treatment for Blue Wave and its failure to provide Three Rivers an opportunity to review the Town's Maximum Building Coverage calculations further supports my finding that the Board's denial was pretextual. Tr. Vol. II, at 50-55; Tr. Exs. 20, 21. 





58. Pearsall testified at trial that Method 2 was a more precise calculation, compared with Method 1 which is a "very crude, a rough first approximation." Tr. Vol. II, at 25-26. 





59. Neither the Board nor Miga nor any employee or agent of the Town checked BlueWave's calculations using Method 2 for either the Beebe Road SES or the Three Rivers Project. Tr. Vol. II, at 40. In the course of providing assistance to a competitor of Three Rivers, the Board, via its representative Pearsall, relied upon that competitor's calculations and conclusion that the Project was noncompliant without allowing Three Rivers an opportunity to review either BlueWave's calculations or its conclusions. 





60. The Board did not inform Three Rivers about the new calculation for Maximum Building Coverage for SES Projects using Method 2, that BlueWave had determined that Three Rivers' proposed Project fell short under Method 2 or that the Town had adopted BlueWave's calculation for its own SES Project. Tr. Vol. II, at 40. Tr. Vol. II, at 42. 





61. Pearsall testified at trial that the Town's engineering department typically reviews calculations involved in zoning applications in-house, such as the special permit application submitted by Three Rivers. Tr. Vol. I, at 204-5. The Town occasionally hires a third-party engineering consultant to analyze more complicated projects if a project involves issues beyond the Town engineers' "level of expertise or practice." Tr. Vol. I, at 206. Pearsall did not seek the input of a third-party consultant regarding the calculation of Maximum Building Coverage for SES. 





Maximum Building Coverage as Calculated by Three Rivers 





62. Three Rivers did not learn that the Board intended to apply the building coverage requirement of Section 4 of the Bylaw to the Project until they received the Decision in January 2019. Three Rivers did not learn how the Board calculated the 25 percent building coverage requirement for the Project until mediation in June of 2019 and did not receive the exact methodology for calculating building coverage that the Board applied to the Project until receiving the Board's Answers to First Set of Interrogatories on approximately July 15, 2020. Tr. Vol. I, at 77-79; Tr. Ex. 23. Jared Donald, a senior vice president and head of the United States region for AMP ("Donald"), testified regarding BlueWave's calculation of Maximum Building Coverage for the Three Rivers' Project and also provided his own calculations. Donald is a licensed professional engineer, holding a bachelor's degree in electrical engineering from the University of Alberta and a masters of business administration from the Haskayne School of Business at the University of Calgary. He has worked in the solar industry since 2005. [Note 4] In addition, Donald has held the position of chair of the board of directors of the solar industry association in Canada and sat as the renewable energy generator representative for the largest electric system operator in North America. 





63. Donald testified that at the time of trial, AMP had seven operating solar projects in Massachusetts, four under active construction and another twelve to fifteen under development. Donald has had active involvement in the engineering and design of Massachusetts projects because of the need for detailed analysis of how solar energy interfaces with energy storage. Tr. Vol. II, at 148-150. The Project site on Three Rivers Road was "very well situated from an interconnection perspective" so as to provide capacity to National Grid. Tr. Vol. II, at 157-159. 





64. At the time of trial, Cook had worked in the solar industry for ten years, including permitting thirteen projects in Massachusetts, but testified that he had never been required to submit a building coverage requirement for any solar project in Massachusetts or the United States. Tr. Vol I, at 24-32, 74- 75. Donald likewise testified that in his experience with AMP and elsewhere he had never before been asked to submit building coverage calculations for an SES project in Massachusetts or anywhere in the United States. Tr. Vol. II, at 168-169. 





65. Donald initially became involved with the Project during Three Rivers' efforts to ensure its Project was in keeping with the character of the neighborhood and approved the reduced size of the solar array, increased setbacks and enhanced screening measures. He later reviewed the Maximum Building Coverage calculations under Section 4 of the Bylaw which the Board relied on to justify its denial of the Application. Tr. Vol. II, at 153-154. When Three Rivers learned from the Board's interrogatory responses in July 2020, about the Method 2 calculation for Maximum Building Coverage, Donald personally performed that calculation for the Project. Using Method 2, Donald determined that the Maximum Building Coverage for the Project was 23.4 percent (below the Section 4 limit of 25 percent). 





66. Donald again undertook the Method 2 calculation for the Project during his testimony at trial and confirmed that figure. During his testimony, Donald carefully and methodically replicated BlueWave's calculation for its Beebe Road site based on the chart provided to Pearsall by Reidy, achieving the same result (Trial Exhibit 15) and with which Donald concurred. [Note 5] However, when Donald tried to replicate BlueWave's analysis for the Project, he found a discrepancy: Donald confirmed the numbers in the centermost columns of BlueWave's chart (parcel size, fenced area (in both acres and in percentage), panel number, panel capacity and megawatt DC), but discovered that the figure in the chart for panel area (or Method 2 footprint for the solar array) for the Three Rivers Project was incorrect and based on an inaccurate assumption. Tr. Vol. II, at 169-177. 





67. According to Donald, and I credit his deliberate and analytical testimony, BlueWave's engineer did not consider the tilt angle of the Three River solar panels, but rather assumed the panels would be flat or parallel with the ground. In contrast, Donald confirmed from BlueWave's several submissions to Pearsall and the Board that its engineers did consider the tilt angle of the solar panels for the Beebe Road project. This approach is more accurate and effectively reduces the area that each solar panel covers. Tr. Vol. II, at 171-182. 





68. When Donald used Method 2 to calculate the Maximum Building Coverage for Three Rivers' own Project, he determined that it was below the 25 percent limit in Section 4 of the Bylaw. Tr. Vol. 1, at 79; Tr. Vol. II, at 179. During his testimony, Donald utilized the actual tilt angle for the Project's solar panels (40 degrees) and concluded that the proposed Project's Maximum Building Coverage would be 23.4 percent. Donald demonstrated his calculations at trial using a calculator, pen and paper and showing his work over Zoom. His calculations were submitted to the court as Exhibit 28. Tr. Vol. II, at 175-189; Tr. Ex. 28. 





69. When Pearsall was questioned, after listening to Donald's testimony, he stated: "[Donald] seems like a very knowledgeable individual with a lot of integrity, and his methodology makes sense to me... I trust that ... with his knowledge and expertise, that his calculations are sound." Tr. Vol. II, at 228-229. 





70. I conclude that if the Maximum Building Coverage requirement of Section 4 of the Bylaw applies to SES Projects, the Three Rivers Project satisfied that requirement. 





71. I credit the testimony of Turner, Cook and Donald that Maximum Building Coverage had never entered into Three Rivers' thinking about the Project because the Solar Bylaw did not indicate such a calculation would apply, none of Miga, Pearsall or the Board had mentioned the need to undertake such a calculation and the Three Rivers team had never been required to do such a calculation for any other SES project in Massachusetts or elsewhere despite their considerable collective combined experience. Tr. Vol. I, at 65-66, 145; Tr. Vol. II, at 168. 





Effect on Neighborhood Property Values [Note 6] 





72. As noted above, one of the reasons for the Board's denial of the Application was a concern that the proposed Project would negatively impact property values and sales in the surrounding neighborhood. Mark F. Tyburski ("Tyburski"), a licensed, experienced, and well credentialed real estate appraiser, was engaged by AMP to provide expert testimony in this regard. [Note 7] Tyburski undertook an analysis of what the impact might be on property values and sales activity resulting from construction of the Project.. He concluded that the proposed Project would not have a negative effect on property values or sales activity in the surrounding neighborhood. Tr. Vol. II, at 93-94; Tr. Ex. 27. 





73. Tyburski's conclusion was based on his inspection of the proposed Project site on Three Rivers Road, as well as three similar SES facilities in Town, each of which was located in a residential neighborhood and had received permits (Main Street, Beebe Road and Tinkham Road). Tyburski prepared a comprehensive written report, included as a trial exhibit, which employed both a paired data analysis and a trend analysis to examine whether prices of real estate in the surrounding neighborhood were impacted by the announcement of the Project. Tyburski concluded that there was no measurable negative impact on those prices, as adjusted for real estate appreciation. Tr. Vol. II, at 105-14; Tr. Ex. 27. 





74. Tyburski further based his opinion on a broad industry-wide search about the potential impact of SES facilities on property values. In particular, Tyburski identified and relied on a thorough nationwide and well-documented study by well-qualified and reliable appraisers at the accounting firm Cohn Reznick who determined that solar facilities did not have a negative impact on property values. Tyburski testified that the methodology and data in the nationwide report were consistent with established appraisal protocols. Tr. Vol. II, at 94-104. 





75. Based on the thoroughness of Tyburski's analysis, his significant experience and credibility and the lack of any evidence to contravene his well-reasoned and documented conclusions, I find that the proposed Project will not have a negative impact on property values or home sales in the neighborhood surrounding the proposed Project. 





Visual Impact and Lack of Harmony with the Neighborhood 





76. As noted above, one of the reasons for the Board's denial of the Application was that the size, scale, and character of the proposed use was not in harmony with the general purpose and intent of the Zoning Bylaw. 





77. Section 10.7.7 of the Bylaw identifies Design Requirements and Performance Standards for SES Projects. Among those requirements is a screening requirement: "Whenever reasonable and practical, the Large-Scale Ground-Mounted Solar Energy Systems shall be screened year-round-from all adjoining properties in residential use and public and private ways." Tr. Ex. 2, at 10-15. 





78. At the second session of the public hearing, the Board requested that a sight line analysis be commissioned by Three Rivers to demonstrate visual impact from the vantage point of one abutting residential property, specifically the property directly across the street from the entrance to the proposed Project, owned by Victor Swist. Tr. Ex. 25, at 2.





79. Three Rivers submitted its Line of Sight Diagram, assessed from the vantage of the second floor of the Swist residence, located across Three Rivers Road from the Project site, which showed that a small portion of the solar array would be visible from the second-floor windows. Tr. Ex. 26, at 2; Tr. Ex. 8, at 2. 





80. Based on the Line of Sight Diagram, Cook testified that he thought the visible portion of the solar array was in the range of five and ten percent at a distance of over 1,300 feet from the Swist home, while Turner testified the visible portion was less than that, estimating two percent or less of the array would be visible. Tr. Vol. I, at 56, 59, 140-144, 174-79. The minutes of the Board's public hearing on November 14, 2018, reported that Three Rivers' "analysis found there to be no visual impact from the proposed development to the [Swist] property. Tr. Ex. 26, at 2. 





81. The Board did not request further sight line analyses from the vantage points of other abutting residential properties, though Three Rivers would have provided additional analyses if they had been requested. Tr. Vol. I, at 151, 172-173, 186. 





82. Pearsall acknowledged on cross-examination that a considerable amount of existing forest covering the wetlands area was not going to be touched. The undisturbed areas of the site total five acres. Tr. Vol. II, at 59, 70. 





83. I find that any projected visual impact of the Project on abutters and the surrounding neighborhood would be de minimis. The SES would be located inside of a sizable buffer area of woodlands on all four sides, also screened by wood fencing erected on berms and further buffered by new plantings (including evergreens) to supplement the remaining woodlands. The proposed Project would be barely visible, if at all, and as so screened is in harmony with the neighborhood. I further find that Three Rivers' wooded buffer area, berm with fence atop and supplemental landscaping were more than reasonable and practical measures to screen the solar array year-round from adjoining properties and Three Rivers Road. 





84. Pearsall provided the following overview of the Town's solar Bylaw: 





 "The vast majority of the land in Wilbraham is zoned residential, and it would be too restrictive to prohibit solar facilities in the residential areas. But the -- so they were allowed by special permit from the Planning Board knowing that that would be a discretionary permit that the Planning Board would have to look at each proposal on a case-by-case basis, making sure that it was appropriate for the particular site that had been chosen. And, in this case -- we have in the past approved three projects as being appropriate for the sites that were selected. In this case it was the determination of the Planning Board that this site was inappropriate for a variety of factors." Tr. Vol. II, at 68. 





DISCUSSION 





 I begin with the standard of review for challenges brought pursuant to Chapter 40A, § 17 and then consider each of the three reasons given by the Board in its Decision for denying the Application and whether that denial exceeded the Board's authority under G. L. c. 40A, § 17. I then evaluate whether the Board's denial constitutes a prohibition or unreasonable regulation of the installation of a solar energy system under G. L. c. 40A, § 3. 





I. Standard of Review under Chapter 40A, § 17 





 A court should "affirm the board's decision unless it finds that denial of the application was 'based on a legally untenable ground, or [was] unreasonable, whimsical, capricious or arbitrary." Aiello v. Planning Bd. of Braintree, 91 Mass. App. Ct. 354 , 366-7 (2017), quoting Britton v. Zoning Bd. of Appeals of Gloucester, 59 Mass. App. Ct. 68 , 72 (2003). Overturning a board's decision is proper when "no rational view of the facts the court has found supports the board's conclusion." Wendy's Old Fashioned Hamburgers of New York, Inc. v. Bd. of Appeal of Billerica, 454 Mass. 374 , 383 (2009). "[T]he board's discretionary power of denial extends up to those rarely encountered points where no rational view of the facts the court has found supports the board's conclusion that the applicant failed to meet one or more of the relevant criteria..." Britton v. Zoning Bd. of Appeals of Gloucester, 59 Mass. App. Ct. 68 , 74-5 (2003).





 In addition, the court generally gives deference to a board's interpretation of its own Bylaw. Duteau v. Bd. of Appeals of Webster, 47 Mass. App. Ct. 664 , 669 (1999). "Although the judge determines the facts, it is the board's evaluation of the seriousness of the problem, not the judge's, which is controlling." Wendy's, 454 Mass. at 382, citing Subaru of New England, Inc. v. Bd. of Appeals of Canton, 8 Mass. App. Ct. 484 , 488 (1979). However, "[w]hen a decision contains conclusions that do nothing more than repeat regulatory phrases, and are unsupported by any facts in the record, [the court is] constrained to conclude that the decision is 'unreasonable, whimsical, capricious or arbitrary,' and therefore invalid." Wendy's, 454 Mass. at 386. "On review, the judge's role is to determine 'whether the reasons given' by the board, 'had a substantial basis in fact, or were, on the contrary, mere pretexts for arbitrary action or veils for reasons not related to the purposes of the zoning law.'" Id. at 387, quoting in part, Vazza Properties, Inc. v. City Council of Woburn, 1 Mass. App. Ct. 308 , 312 (1973). See also Bevilacqua Co. vs. Lundberg, Mass. Land Ct., No. 19 MISC 000516 (HPS) (Nov. 2, 2020) (Not Reported). 





II. The Board's Three Reasons for Denying the Special Permit 





 I begin by considering whether the evidence submitted at trial supports the Board's denial of the special permit in accordance with Chapter 40A, § 17. The denial rests on essentially three categories of findings by the Board as set forth in the Decision. Each category of findings is examined below. 





 A. Effect on Neighborhood Property Values 





 As one basis for denying the Application, the Decision found that the proposed Project would have an adverse impact on property values and sales in the surrounding neighborhood. 





More specifically, in pertinent part, the Decision stated: 





 At the public hearing the Planning Board heard credible verbal testimony from abutting property owners and the opinion of local real estate professionals that the proposed commercial solar use has had a chilling effect on existing home sales and, if constructed, will result in reduced property values for homes in the surrounding neighborhood. 





Tr. Ex. 3, ¶ 16. 





 At trial, Three Rivers refuted this finding by presenting the testimony of a licensed, experienced and well-credentialed real estate appraiser. This appraiser, Mark F. Tyburski ("Tyburski") undertook a thorough analysis of what impact the proposed Project would have on real estate values and sales in the neighborhood surrounding the proposed Project. [Note 8] Tyburski prepared a written report which was introduced as a trial exhibit and testified as to its content and his analysis. Tr. Ex. 27, at 7-220. Tyburski opined that the proposed Project would not have any adverse impact on either real estate values or sales in the neighborhood, as adjusted for real estate appreciation. Tr. Vol. II, at 105-14; Tr. Ex. 27. He reached this conclusion after undertaking both a paired data analysis and a trend analysis which examined changes (or the lack thereof) in real estate values and sales for other neighborhoods in Wilbraham where SES Projects were installed and then correlated his findings with the characteristics of the Three Rivers neighborhood. 





 As further support for his opinion and as documented in his report and presented at trial, Tyburski undertook a broad industry-wide search regarding the potential impact of SES Projects on property values. In particular, Tyburski identified and relied on a thorough nationwide and well-documented study by well-qualified and reliable appraisers at the accounting firm Cohn Reznick which determined that SES Projects do not have a negative impact on property values. Tyburski testified that the methodology and data in the nationwide report were consistent with established appraisal protocols and with his due diligence in Town and his conclusions about the proposed Project. Tr. Vol. II, at 94-104. I credit Tyburski's opinion based on his forthright demeanor, considerable training, credentials, and many years of experience and also as supported by his detailed, thorough and thoughtful analysis of the Wilbraham residential market. His additional national review further supported his conclusions. 





 At trial, the Board failed to introduce any evidence to contradict Tyburski's opinion, whether from another real estate appraiser or otherwise. Although the Board argued that the proposed Project would chill the sale and value of residential properties in the Three Rivers neighborhood, those concerns proved to be unfounded and amounted to no more than a repetition of anecdotes and thoughts shared by laypeople at the public hearing. Notably, in contrast, the Board had previously approved special permits for SES Projects in other residential neighborhoods in Town without apparent concern for property values and sales. The Board's concerns were further dispelled by the fact that the proposed Project would be substantially screened from abutting or nearby properties by a sizeable woodland buffer area. Based on the lack of evidence to contravene Tyburski's analysis, I conclude the proposed Project would not have any adverse impact on either real estate values or sales in the surrounding neighborhood, 

and I further find that there was no admissible evidence at trial from which a contrary conclusion could be drawn. 





 Accordingly, this stated basis for the Board's Decision did not have a substantial basis in fact, but was wholly unsupported at trial, arbitrary and capricious. See Wendy's, 454 Mass. at 387. 





 B. Exceedance of Maximum Building Coverage Requirement in Section 4 of the Bylaw. 





 Much of the testimony and documentary evidence at trial centered around another of the Board's bases for denying the special permit -- that the proposed Project exceeded the allowable Maximum Building Coverage under Section 4 of the Bylaw. Specifically, the Decision stated: 





 The submitted design of the proposed use will result in a solar array with a total footprint area of approximately 10.4 acres which represents approximately 48 percent of the total area of the subject property and which would significantly exceed the maximum building coverage requirement of 25 percent in the [R-60] Zoning District imposed under section 4.4.8..." Tr. Ex. 3, ¶ 13. 





 While I acknowledge that the court must give deference to the Board's interpretation its Bylaw, I am convinced after trial that this basis for denying a special permit to Three Rivers cannot stand. In sum and as discussed below, there are several reasons for this conclusion: (1) the Board's historical treatment of other SES Projects in Town, preferential treatment afforded other developers of other SES Projects in Town vis-à-vis Maximum Building Coverage and failure to disclose to Three Rivers the applicability of the Maximum Building Coverage requirement all of which indicate that the Board's use of this requirement to deny the Project was a pretext; (2) the Board's failure to accurately calculate Maximum Building Coverage for the proposed Project; and (3) my conclusion that application of Maximum Building Coverage to SES Projects was legally untenable. 





 1. History of SES Projects in Town, Preferential Treatment for Other SES Projects and Failure to Disclose Applicability of Maximum Building Coverage to Three Rivers. 





 As detailed in the Findings of Fact, prior to issuing the Decision on January 31, 2019, the Board had granted special permits to two other applicants to construct similar SES Projects, one on Main Street and another on Beebe Road (on September 16, 2015 and November 14, 2108, respectively). These locations, just like Three Rivers' proposed location, fell within the Town's residential zoning districts. For neither of those projects did the Board consider Maximum Building Coverage when reviewing those permit applications, nor did it apply any requirement in Section 4 of the Bylaws to either project. Tr. Vol. I, at 245-9; Tr. Vol. II, at 14-15; Tr. Exs. 11, 12. 





 Also detailed in the Findings of Fact, Pearsall initially rejected the idea that the Maximum Building Coverage provisions in Section 4 of the Bylaw might apply to SES Projects. Instead, he only warmed to the idea when thinking about how to craft a decision denying the Application. Pearsall testified that in October 2018, between the first and third sessions of the public hearing, he was contacted by a real estate attorney (and former member of the Wilbraham Board of Appeals) by the name of H. Clark Abbott ("Abbott") who was considering representing several neighbors near the Three Rivers site. It was Abbott who first suggested that the plans for the proposed Project exceeded the Maximum Building Coverage. When Abbott made this suggestion, Pearsall replied: 





 "My response to him -- and it was a very quick reply -- is I said, I don't believe that would apply to this kind of use. Because building coverage has not come up a lot in Wilbraham. It's been very rarely invoked. It's always been in the context of somebody building a single family home in a residential area". 





In fact, Pearsall never shared this idea with the Board because, "I just didn't think it was relevant to what we were reviewing."





 Pearsall later changed his mind. He testified that when it became clear that there was a consensus of the Board to deny the Application and he was asked to craft a decision, he recalled Abbott's suggestion, took a look at Section 4 and it occurred to him that this might be a "supporting or supplemental" basis for denial. It couldn't be the "primary" reason the Board for denial "because the ... Board wasn't even aware of it when they concluded that they wanted to deny the project." As Pearsall explained, the consensus of the Board members was that the Application should be denied principally based on the Project's size, scale, and visual impact. 





 Although the Board met once or twice in open session to deliberate regarding Pearsall's draft decision and whether to include the Maximum Building Coverage as a basis for the denial, Three Rivers was never advised of these discussions or provided an opportunity to participate. Indeed, the Town never disclosed to Three Rivers that Maximum Building Coverage was a factor in the approval process for special permits for SES Projects during introductory and planning meetings before the Application was filed or during the multiple sessions of the public hearing or site visit. Although Pearsall, Miga and the Board requested numerous "homework" assignments of Three Rivers during the application process, at no point was a coverage calculation requested. For instance, neither of Miga's two engineering memoranda to Pearsall mentioned any need to calculate Maximum Building Coverage. Pearsall confirmed during his testimony that Three Rivers had satisfactorily addressed all of Miga's various engineering comments and requests. [Note 9] 





 I credit the testimony of Turner, Cook and Donald that lot coverage had never entered into Three Rivers' thinking about the Project and instead, they relied on the Solar Bylaw, which nowhere indicated that any such a calculation would apply. Pearsall conceded at trial that he had never mentioned Maximum Building Coverage to Three Rivers during the application process, nor had Miga or the Board. This concession is consistent with Pearsall's acknowledgement that he hadn't considered the application of Maximum Building Coverage to SES Projects prior to the conclusion of the public hearing for Three Rivers' Application. Indeed, according to Pearsall, the Board: 





 "felt the applicant had done... a really good job of presenting materials to the Board. That they had been responsive to the Board's requests and had provided additional information. That the people that they had representing them before the Board were considered excellent people who were very knowledgeable and, again, responded to the ... Board's questions. But so they felt that they done a great job on that hand." 





In other words, as Pearsall responded when he was asked if Three Rivers had presented a "nice project, but the wrong location?"; he replied "Exactly." 





 I conclude that the Board did not consider the application of Maximum Building Coverage until Pearsall suggested this idea to the Board, which took place after the Board decided to deny Three Rivers' Application. Further, given Three Rivers' successful track record in accommodating each of the Town's requests, and in light of the Board's high regard for the Three Rivers team, it is reasonable to conclude that had Three Rivers been asked to present calculations addressing Maximum Building Coverage, they would have welcomed the opportunity to do so. At the close of the hearing, Three Rivers asked the Board whether there was any further information that they needed or if there was anything further Three Rivers could do and the response was "No." Three Rivers did not learn that the Board intended to apply the building coverage requirement of Section 4 of the Bylaw to the Project until they received the Decision in January 2019. 





 The extent to which the Town disfavored Three Rivers became clear at trial and was illustrated by the Town's helping hand toward another SES developer, BlueWave, which owned the Beebe Road project. In the summer of 2019, Pearsall went back to review the two SES Projects (on Main Street and Beebe Road) that had been approved by the Board prior to the Decision to see if they satisfied the Maximum Building Coverage provision in Section 4. He asked Miga to undertake calculations for those two projects using what he described as "Method 1." Miga determined that the Beebe Road project exceeded the Maximum Building Coverage limit at 39 percent. Pearsall then took affirmative steps to help BlueWave, because Pearsall was concerned that the Beebe Road project might be susceptible to an enforcement challenge and might want to take steps to prove they were not in violation of the Maximum Building Coverage requirements as newly applied by the Board to SES Projects. 





 Pearsall contacted Reidy, counsel for BlueWave, and suggested that BlueWave might consider recalculating the Maximum Building Coverage for its project by using a more precise calculation he had recently devised, called "Method 2." [Note 10] Reidy offered to have BlueWave's engineering consultant undertake the Method 2 calculation. Reidy readily agreed and also offered to have BlueWave's engineer analyze Three Rivers' Project using Method 2 to see 

whether there might be a distinction between the Beebe Road project and the Project. Pearsall sent Reidy the Three Rivers plans for this purpose. 





 Reidy reported back to Pearsall that the Beebe Road project complied with the Maximum Building Coverage limits of Section 4 using Method 2 (at 15 percent), but that the Project failed (at 31 percent). Pearsall conceded at trial that neither the Board nor Miga nor any employee or agent of the Town verified BlueWave's calculations using Method 2 for either the Beebe Road SES or the Three Rivers Project. Nor did Pearsall or the Town provide Three Rivers with an opportunity to review BlueWave's calculations using either the Method 1 or Method 2. Ultimately, Pearsall requested and Reidy delivered a letter and plan from BlueWave's engineer stating that the Beebe Road SES complied with the Maximum Building Coverage requirement in effect at the time its special permit issued. [Note 11] 





 I conclude that the Board applied Maximum Building Coverage to the Project, even though it had historically never been applied to SES Projects, as a pretext in order to deny a special permit to an otherwise conforming and well-planned SES Project. The Board's application of different interpretations (i.e. different methodologies) to different SES special permit applicants was arbitrary, capricious and legally untenable. See Fieldstone Meadows Dev. Corp. v. Conservation Comm'n Of Andover, 62 Mass. App. Ct. 265 (2004) (a denial of an application cannot be made so long as the reason for the denial was a standard not applied uniformly to all applicants). This pretextual or otherwise arbitrary basis for denial cannot support the Decision. Shirley Wayside Ltd. P'ship, 461 Mass. 468 , 485 (2012) ("The board is obligated to apply its own standards rationally.") "In the administration of controls limiting the use of land -- as with any exercise of the police power--uniformity of standards and enforcement are of the essence. If the laws are not applied equally they do not protect equally." Fafard v. Conservation Commn. of Reading, 41 Mass. App. Ct. 565 , 569 (1996), citing SCIT, Inc. v. Planning Bd. of Braintree, 19 Mass. App. Ct. 101 , 106--111, (1984). 





 2. Failure to Accurately Calculate Maximum Building Coverage for the Project. 





 Another ramification of the Town's reliance on BlueWave's calculations was that those calculations were simply incorrect. At trial it became evident that BlueWave had calculated Maximum Building Coverage for the Three Rivers Project based on a flawed assumption about its design. As it turned out, although the Decision stated that the Project exceeded the Maximum Building Coverage requirement of 25 percent, Three Rivers did not know how the Board had performed that calculation (using Method 1) until a mediation took place in June of 2019; and, did not obtain the Method 2 methodology that had been used by BlueWave to calculate and confirm the Project's exceedance for Pearsall until Three Rivers received the Board's Answers to First Set of Interrogatories in July of 2020. 





 When Three Rivers learned about Method 2, Donald personally performed his own calculations for the Project and came to a markedly different result. [Note 12] When Donald tried to replicate BlueWave's calculations for the Project, he discovered an error. According to Donald, and I credit his deliberate and analytical testimony and his methodical calculations which he walked the court through during his testimony, BlueWave's engineer did not consider the tilt angle of the Three River solar panels, but rather assumed the panels would be flat or parallel with the ground. [Note 13] Consideration of the tilt angle produces a more accurate and precise calculation, and effectively reduces the area that each solar panel covers. Applying Method 2 to the precise design characteristics of the Three Rivers plans, Donald determined that the Maximum Building Coverage for the Project was 23.4 percent --- below the Section 4 limit of 25 percent. Donald demonstrated his calculations at trial using a calculator, pen and paper and showing his work over Zoom. His calculations were submitted to the court as Exhibit 28. 





 After listening to Donald's testimony and when questioned about his calculations, Pearsall conceded the Town's error. Pearsall stated: "[Donald] seems like a very knowledgeable individual with a lot of integrity, and his methodology makes sense to me... I trust that ... with his knowledge and expertise, that his calculations are sound." Accordingly, I conclude that as a matter of fact, the Project satisfied the Maximum Building Coverage requirement of Section 4 of the Bylaw. The Board's denial of a special permit cannot be sustained based on its mistaken finding that the Project exceeded the Section 4 limit. 





 3. Application of Section 4.4.8 to SES Projects Was Legally Untenable 





 Although courts generally give deference to a board's interpretation of its own bylaw, I cannot do so in this case. Duteau v. Bd. of Appeals of Webster, 47 Mass. App. Ct. 664 , 669 (1999). Testimony at trial established that the Board's interpretation of the applicability of Section 4's requirement of Maximum Building Coverage to SES Project had changed just recently and only for the purpose of denying a special permit for this Project. 





 I begin by noting that three members of the Three Rivers team testified that they had never been required to undertake lot coverage calculations for any other SES project in Massachusetts or elsewhere, despite their collective substantial experience securing permits and approvals for solar projects in Massachusetts and elsewhere in the United States. Notably also, Pearsall testified that when Abbott first suggested that Maximum Building Coverage might be grounds to deny the Project, his initial response was " I don't believe that would apply to this kind of use... It's always been in the context of somebody building a single family home in a residential area." At the time of trial, when Pearsall made that comment, he had recently retired as the Town's Planning Director. Although Pearsall later tried to explain that he considered "Maximum Building Coverage" to be the same thing as "maximum lot coverage," I reject that interpretation as a post hoc rationalization in part because Pearsall's testimony in this regard was halting and strained, in contrast to the ease with which he testified about his initial response to Abbott. I find that Pearsall's initial instinct honestly reflected not only the Board's historic practice but also the organizing structure and plain reading of the Bylaw, as discussed below. Likewise, the experience of the Three Rivers' team demonstrated the strained nature of the Board's reading when it reached beyond the Solar Bylaw to apply a residential dimensional requirement to this SES Project. 





 Pearsall's revisionist interpretation is inconsistent with the organizing structure of the Bylaw. Courts interpret the meaning of a bylaw by the ordinary principles of statutory construction and look to the statutory language as the principal source of insight into legislative intent. Shirley Wayside Ltd. P'ship, 461 Mass. at 477. Courts endeavor to interpret a statute to give effect "'to all its provisions, so that no part will be inoperative or superfluous.'" Connors v. Annino, 460 Mass. 790 , 796, 955 N.E.2d 905 (2011), quoting Wheatley v. Massachusetts Insurers Insolvency Fund, 456 Mass. 594 , 601, 925 N.E.2d 9 (2010). The Bylaw includes distinct sections regulating residential projects on the one hand and SES Projects on the other. Section 4 of the Bylaw, entitled "Single Dwelling Residence Districts," regulates the various residential districts in Town, including the R-60 District where the Project site is located. Nowhere does Section 4 refer to solar energy systems or indicate that SES Projects in a residential district are governed by Section 4. Instead, the Bylaw includes an entire section regulating SES Projects, entitled "Large-Scale Ground-Mounted Solar Energy Systems." Nor does the Solar Bylaw make reference to Section 4 or to Maximum Building Coverage. 





 The organizing structure of the Bylaw indicates that the Solar Bylaw is a standalone section and is not dependent on the provisions regulating the district within which an SES Project is located. The Solar Bylaw includes its own dimensional requirements, tailored to SES Projects, but omits (or omitted, at least until 2019), [Note 14] the concept of lot coverage entirely. Both Section 4 and the Solar Bylaw contain their own dimensional requirements regulating setbacks and heights and the like. There is no rational basis for the Board to choose to apply only one of many dimensional provisions within Section 4 to SES Projects. 





 Nor does the plain language of the Bylaw support Pearsall's new interpretation. Courts enforce the statutory language of a bylaw according to its plain wording "unless a literal construction would yield an absurd or unworkable result." Shirley Wayside, 461 Mass. at 477, quoting Boston Hous. Auth. v. National Conference of Firemen & Oilers, Local 3, 458 Mass. 155 , 162 (2010). The term Maximum Building Coverage derives from Section 4 of the Bylaw governing residential projects (Section 4.4.4) and provides: "The total aggregate lot area covered by all principal and accessory buildings and structures shall not exceed the percentage specified in the applicable residence district, as listed in the schedule in Section 4.4.10." Scrutiny of the plain language within Section 4.4.4 does not support its application to SES Projects. SES Projects do not contain "principal buildings." Instead, the primary structures are arrays of ground-mounted solar panels. While an SES Project may include an accessory building, the absence of any "principal building" renders application to SES Projects nonsensical. 





 Equating Maximum Building Coverage with "maximum lot coverage" would expand the meaning of "building" beyond its common meaning and would be inconsistent with the Bylaw's definitions for "Building" and "Building Coverage." According to the Definitions in Section 1.3 of the Bylaw, a "Building" is defined as "An enclosure intended for the shelter of persons, animals, or property including any part of a building and porches and accessory buildings attached thereto," while "Building Coverage" is defined as "The percentage which the aggregate area of all buildings in a lot bears to the area of the lot." Here, no portion of an SES Project forms a roof enclosure intended for shelter. 





 I conclude that it was error for the Board to apply the requirement of Maximum Building Coverage in Section 4 of the Bylaw to the Project. This newly devised interpretation is not entitled to deference because it is both legally untenable and reflects an unreasonable, whimsical, capricious and arbitrary exercise of Board's judgment in applying the Bylaw to the proposed Project. Shirley Wayside Ltd, 461 Mass. at 485; Wendy's, 454 Mass. at 382. 





 C. Visual Impact and Lack of Harmony with the Neighborhood 





 The remainder of the Board's bases for denying the Application can be summarized generally into two categories: (1) findings that the size, scale and character of the proposed Project would have a significant negative visual impact on the abutting residential neighborhood which (Paragraphs 15 and 20 of the Decision) [Note 15]; and (2) findings that the proposed Project would not be in harmony with or suitably located in the neighborhood (Paragraph 17, 18 and 20 of the Decision). [Note 16] These findings are not grounded in the Project's failure to satisfy the Design Requirements and Performance Standards of the Solar Bylaw, but instead rely on the special permit criteria in Section 13.6.5 of the Bylaw. 





 As detailed in the Findings of Fact above and discussed below, these special permit findings were not borne out by the evidence at trial and are also inconsistent with the Board's finding that the proposed Project satisfied the requirements of the Solar Bylaw. I reject the Board's argument that even if the proposed Project satisfied all of the Design Requirements and Performance Standards of the Solar Bylaw, it was within the Board's discretion to deny the Application because Section 10.7. 9 requires a special permit for SES Projects. I first discuss the lack of factual support for the Board's findings regarding visual impact and lack of harmony and then turn to the Board's argument that the special permit criteria of the Bylaw provide an independent bases to deny the Application. 





 1. Visual Impact On The Abutting Residential Neighborhood 





 Section 10.7.7 of the Solar Bylaw lists fifteen Design Requirements and Performance Standards for Large-Scale Ground-Mounted Solar Energy Systems. Several of those pertain to visual impact and harmony with the surrounding neighborhood. Section 10.7.7 (B) establishes minimum setbacks for SES Projects (front yard setback no less than 75 feet, side and rear yard no less than 50 feet) and Section 10.7. 7 (F) requires that "[w]henever reasonable and practical, the Large-Scale Ground-Mounted Solar Energy Systems shall be screened year- round from all adjoining properties in residential use and public and private ways," the latter seeming to indicate that SES Projects should be approved even if it's not practical to screen them entirely. In addition, Section 10.7.7 (C) provides that the height of solar panels shall not exceed fifteen feet above finished grade and Section 10.7.7 (F) provides: 





 "Whenever reasonable and practical, [SES Projects] shall be screened year round from all adjoining properties in residential use and public and private ways. If the applicant provides information that the visual buffe would have a detrimental impact on the ability to generate power, the Planning Board may grant a waiver to reduce or eliminate the screening requirement in subsection 10.7.13." 





The Design Requirements & Performance Standards also regulate lighting and noise. The Board found that the Application satisfied all of these requirements and I concur. 





 The site proposed for Three Rivers' SES Project is a 21.7-acre undeveloped, wooded parcel located in a residential zoning district. After reviewing the evidence presented at trial, I find that the proposed SES would be situated on 16.6 acres of the Property, of which only 9.2 acres would be used for actual solar arrays, which would reach a maximum height of nine (9) feet (well below the fifteen foot limit). At the request of the Board, Three Rivers substantially revised their plans to minimize and mitigate any adverse visual impacts from the Project, by reducing the size of the array, increasing setbacks and adding supplemental screening. The final revised plans, dated November 5, 2018, reduced the footprint of the solar array component of the SES by about 25 percent from the original plan, further increased the setbacks and incorporated a nine to ten-foot-high wooden fence atop a two-foot-high berm to screen the visual impacts of direct abutters as they looked out of their backyards toward the woodland and SES. In addition, the Proposed SES would be visually screened from abutting properties by a buffer of existing woodlands on all four sides ranging between 100 at the eastern and northern boundaries and 150 feet at the southern boundary (2-3 times the Bylaw requirement), then a berm with a wooden fence atop (with breaks in it so that wildlife could travel back and forth), and supplemental plantings including evergreens. The Decision concluded that these measures satisfied the Bylaw requirements for minimizing and mitigating adverse visual impacts to the maximum extent reasonable and practical and for reasonable and practical screening. I concur. 





 In addition, at the request of the Board, Three Rivers commissioned a sight line analysis. That analysis revealed that a portion of the SES would be visible from one property, 270 Three Rivers Road (the Swist Residence). However, I find that the visible portion comprised no more than two to five percent of the entire array and was visible only from the vantage point of the second floor of the house -- across a distance of approximately 1,300 feet from the Swist Residence and across Three Rivers Road and the woodland buffer area. Significantly, the minutes of the Board's public hearing on November 14, 2018, reported that Three Rivers' site line "analysis found there to be no visual impact from the proposed development to the [Swist] property." Tr. Ex. 26, at 2. The Board did not request further sight line analyses from any other properties or vantage points. 





 Lastly, during my site visit, as we traversed a bushwhacked path through the woods generally in the location of the fence and berm, only occasional glimpses of the abutting residential properties were visible and only then primarily when looking upwards toward the blue sky, such that occasional rooftops were partially visible. I find that the visual impact of the Project on abutters and the surrounding neighborhood, as mitigated by the reduced array, existing substantial woodland buffer area, robust screening measures and new plantings, would be de minimis. See Kenner v. Zoning Bd. of Appeals of Chatham, 459 Mass. 115 , 124 (2011). For these reasons, I conclude that the Board's findings that the proposed Project failed to comply with special permit criteria relating to negative visual impact were not substantiated by the credible evidence at trial and cannot support denial of the special permit. 





 2. Lack of Harmony With or Suitable Location in the Neighborhood 





 As for the Board's findings related to lack of harmony with the neighborhood, it is difficult to imagine what aspect of the proposed Project might be out of harmony with the neighborhood since the Board found the proposed Project satisfied all of the Bylaw's Design Requirements and Performance Standards for SES Projects. The Solar Bylaw is devoted entirely to SES Projects and provides comprehensive regulation of SES Projects. One might imagine in the abstract, for instance, that the proposed Project could be out of harmony with the neighborhood because it was noisy or that light emanated from the solar array. However, the Solar Bylaw regulates noise and lights from SES Projects at Paragraphs J and E. During the application process, Three Rivers submitted a noise study that was accepted by the Board; no lighting whatsoever was proposed for the Project. The Decision found that the proposed Project satisfied the noise standards in Paragraph J and the light standards in Paragraph E. In facts, as noted above, the Board found the proposed Project met all of the comprehensive Design Requirements and Performance Standards adopted for SES Projects, which encompassed and regulated a wide range of issues: minimum lot size, setbacks, height limits, appurtenant structures, lighting, screening, vegetative clearing, habitat fragmentation, signage, noise, utility connections, stormwater management, security measures, emergency access, and an emergency response plan. 





 I conclude that the Board, having found that the SES facility proposed in Three Rivers' Application met each of the detailed and enumerated Design Requirements and Performance Standards, could not reasonably deny Three Rivers a special permit under the rubric of lack of harmony with the neighborhood. The findings in the Decision regarding the lack of harmony are conclusory, lack factual support and simply repeat the of language in the Bylaw. For instance, the Decision does not articulate how the proposed Project would be out of harmony with the community or injurious in any way. This type of statutory parroting is inadequate to support denial of a special permit. See Wendys, 454 Mass at 387. I find that the Board's denial of Application was arbitrary and not rationally supported by the credible evidence presented at trial. 





 Likewise, it was arbitrary and unreasonable for the Board to find that the proposed Project was not suitably located in the neighborhood in which it was proposed or that it was not compatible with the character and scale of other similar uses permitted in the same district, since SES Projects were allowable in this district and since all of the Design Requirements and Performance Standards in the Solar Bylaw were satisfied. Here again, the Board's finding is conclusory and do not meet the very low bar for findings supporting a special permit denial. There is no credible evidence to support their finding that the proposed Project would be out of step with the harmony of the neighborhood. See Shirley Wayside Ltd., 461 Mass. at 485. 





 3. No Rational Basis to Deny a Special Permit for the Three Rivers Project 





 Having reviewed each of the Board's reasons for denying a special permit to Three Rivers as set out in the Board's Notice of Decision, I conclude that each is wholly unsubstantiated and cannot rationally support the denial. In sum, this is one of those rare instances "where no rational view of the facts the court has found supports the board's conclusion." Wendy's, 454 Mass. at 383 (2009). 





 Rather, I conclude that the Board's findings were "pretexts for arbitrary action or veils for reasons not related to the purposes of the zoning law.'" Id. at 387, quoting in part, Vazza Properties, Inc. v. City Council of Woburn, 1 Mass. App. Ct. 308 , 312 (1973). See also Bevilacqua Co. vs. Lundberg, Mass. Land Ct., No. 19 MISC 000516 (HPS) (Nov. 2, 2020) (decision was pretextual as it provided no factual support apart from repeating the statutory language). In this regard, it is evident from the minutes of the three sessions of the public hearing, Pearsall's testimony and the text of the Decision itself that there was considerable opposition to the proposed Project by neighbors who may have grown accustomed to the benefits of living near the undeveloped land. I need go no further in surmising the Board's real reason for denying a special permit. What is clear, however, is that it was improper for the Board to deny the Application just because the proposed Project did not correspond with their vision for the neighborhood or they "would prefer a different use of the locus, or no use." See Prime v. Zoning Bd. of Appeals of Norwell, 42 Mass. App. Ct. 796 , 802-803 (1997), where the Appeals Court affirmed annulment of a board denial of an application to construct a farm stand on land that was determined to be entitled to agricultural use protection under Section 3, because the special permit requirements were applied unreasonably and in a way that amounted to an arbitrary denial or an undermining of the protected use. Id. at 802-803. The Board's denial must be annulled. 





III. The Decision Runs Afoul of 40A, § 3 





 Three Rivers further contends that the Board's denial of its Application constitutes an unreasonable regulation of the installation of solar energy systems in violation of the ninth paragraph of Chapter 40A, § 3, otherwise known as the Dover Amendment. The ninth paragraph provides, in pertinent part, as follows: 





 No zoning ordinance or by-law shall prohibit or unreasonably regulate the installation of solar energy systems or the building of structures that facilitate the collection of solar energy, except where necessary to protect the public health, safety or welfare. 





In addition to protections for solar energy systems, Chapter 40A, § 3 also provides exemptions from local zoning for religious uses, non-profit educational uses, agricultural uses, child care facilities and handicap accommodations. See Tracer Lane II Realty, LLC vs. Waltham, Mass. Land Ct., No. 19 MISC 000289 (HPS) (Mar. 5, 2021) (providing a fulsome list of § 3 cases). 





 To date, although no appellate decisions address the extent to which municipalities may regulate SES Projects consistent with Chapter 40A, § 3, several Land Court decisions are instructive. In PLH LLC vs. Ware, Mass. Land Ct., No. 18 MISC 000648 (WL 7201712) (Piper, C.J.) (Dec. 24, 2019), the court considered whether a municipality could require a solar developer to apply for a special permit under the local bylaw and concluded that Section 3 does not expressly prohibit the regulation of SES Projects by means of the special permit process, because "there is no express statutory treatment of the question of special permit requirements for solar uses, and that is something which is found in certain other paragraphs of G. L. c. 40A, § 3 protecting different sibling § 3 uses." PLH LLC, WL 7201712 at 2. The court upheld the special permit requirement so long as "the review of the municipality...must be limited and narrowly applied in a way that is not unreasonable, is not designed or employed to prohibit the use or the operation of the protected use, and exists where necessary to protect the health, safety or welfare." Id. at 3. Here, as discussed above, the Board did not do so. See also Northbridge McQuade, LLC v. Thomas Hansson Member of the Northbridge Zoning Board of Appeals, et al. (18 MISC 000519)(Piper, C.J.) (rejecting an argument that the solar exemption under Section 3 permitted an absolute prohibition of SES Projects within certain zoning districts because the purpose of the statutory protections is "to require some 'standing down' by municipalities to encourage and protect solar facilities -- a use that might be seen as unwelcome in municipalities at a local level -- by abutters, nights, neighbors, and by town government"). Order Granting Partial Summary Judgment, June 17, 2019. See also Tracer Lane Realty II, LLC v. City of Waltham, Mass. Land Ct., No. 19 MISC 000289 (Speicher, J.) (Mar. 5, 2021). 





 Consistent with these decisions, I concur with Plaintiffs and conclude that the Board's denial of Three Rivers' Application constitutes an unreasonable regulation of the installation of solar energy systems in violation of Section 3. I do so for two distinct reasons. First, as detailed above, the credible evidence at trial established that the proposed Project satisfied all of the requirements identified by the Board in the Decision, even when those requirements far exceeded the Design Requirements and Performance Standards in the Solar Bylaw (specifically, with respect to negative impact on property values and sales, exceedance of Maximum Building Coverage under Section 4 of the Bylaw and failure to satisfy the special permit criteria under Section 13.6.5 of the Bylaw). The Board's findings to the contrary were not borne out by the credible evidence at trial. Here, having already concluded that the Board lacked any rational or lawful basis to deny Three Rivers' Application, it follows and I further conclude that the Bylaw, as applied by the Board in its Decision, unreasonably regulates the installation of solar energy systems in violation Chapter 40A, § 3. 





 Secondly, I turn to the Board's concerted effort to expand its review of the proposed Project beyond the confines of the Solar Bylaw (Section 10.7). Here, the Board thrice expanded its review beyond the Solar Bylaw even though the Town had adopted a comprehensive special purpose bylaw specifically for SES Projects. After finding that the Project complied with the Solar Bylaw, the Board proceeded to apply the special permit criteria in Section 13.6.5, the Maximum Building Coverage requirements in Section 4 and the concept of harm to property values without reference to any portion of the Bylaw. The question thus arises whether it was an unreasonable regulation of solar energy facilities to do so. "Unreasonable" regulation under Section 3 has generally been determined to be regulation that as a practical matter amounts to a prohibition or otherwise unduly restricts the protected use. There are several ways in which an applicant may demonstrate "unreasonableness." A zoning requirement is unreasonable if it detracts from usefulness of structure, imposes excessive costs on applicant, or impairs the character of a proposed structure. Trustees of Tufts College v. Medford, 415 Mass. 753 , 759--760 (1993). In PLH LLC, the court explained that a bylaw "cannot unreasonably regulate, cannot impose conditions that go beyond statutory limits provided under § 3, cannot be used either directly or pretextually as a way to prohibit or ban the use, and cannot be used to allow the board any measure of discretion on whether the protected use can take place in the district, because to do so would be at odds with the protections provided under § 3." PLH LLC. WL 7201712 at 9. 





 I conclude the Board ran afoul of Chapter 40A, § 3 when it disregarded the Project's satisfaction of the Solar Bylaw standards and instead proceeded to further require satisfaction of the special permit criteria in Section 13.6.5 of the Bylaw. I therefore reject the Board's argument that it had the discretion to deny the Application even after finding the Project satisfied the Design Requirements and Performance Standards of the Solar Bylaw. Careful consideration of the Bylaw indicates that the Solar Bylaw was intended to be a comprehensive provision governing all aspects of ground mounted solar energy systems. The Solar Bylaw includes fifteen Design Requirements and Performance Standards encompassing both dimensional requirements (such as minimum lot size of five (5) acres, minimum front yard setback distance of 75 feet, minimum side yard and rear yard setbacks distance of 50 feet, and height of the solar panels not to exceed fifteen (15) feet above finished grade) and performance requirements (addressing lighting, screening, vegetation clearing, noise and stormwater management, among others). Consideration of the special permit criteria after concluding the requirements of the Solar Bylaw were satisfied was particularly problematic because the special permit criteria overlap with the standards in the Solar Bylaw to considerable degree (for instance, as to dimensional requirements and screening). Compare The Bible Speaks v. Board of Appeals of Lenox, 8 Mass. App. Ct. 19 , 33 (1979) ("In our opinion, the provisions of the by-law taken together invest the board with a considerable measure of discretionary authority over an educational institution's use of its facilities and create a scheme of land use regulation for such institutions which is antithetical to the limitations on municipal zoning power in this area prescribed by G. L. c. 40A, § 3. The Legislature did not intend to impose special permit requirements, designed under c. 40A, § 9, to accommodate uses not permitted as of right in a particular zoning district, on legitimate educational uses which have been expressly authorized to exist as of right in any zone). See also Trustees of Tufts College v. Medford, 415 Mass. 753 , 765, (1993) (holding that the Land Court properly declared invalid site plan and special permit requirements as applied to any future, unspecified projects on Tufts campus). 





 The Board further ran afoul of Section 3 when it based its denial on a finding that the proposed Project ostensibly failed to comply with Section 4 of the Bylaw limiting Maximum Building Coverage to no more than 25 percent in the R-60 Zoning District. It was unreasonable to apply this residential requirement when the Solar Bylaw contained no such lot coverage provision and where the Bylaw and the Town provided no notice that Section 4 would apply to the proposed Project. Not only did the Board fail disclose its intent to consider Maximum Building Coverage until the Decision issued, but its subsequent efforts to assist BlueWave, a competitor of Three Rivers, went so far as to adopt BlueWave's erroneous calculations for the proposed Project without advising Three Rivers or providing Three Rivers with an opportunity to verify the calculations. Ultimately, the credible evidence at trial established that the Board's finding was analytically erroneous and predicated upon flawed assumptions derived from that competitor's analysis. 





 Lastly, the Board added impact on property values to the gauntlet of standards required for Three Rivers to obtain a special permit, even though the Solar Bylaw made no mention of this consideration (nor did the special permit criteria). I conclude that use of these expanded and unannounced criteria even though the Project fully complied with the Solar Bylaw constituted an unreasonable regulation of solar facilities, unrelated to the protection of public health, safety or the welfare of the community, and effectively gave the Board unfettered discretion to deny the Application.





CONCLUSION 





 I find that each of the reasons for denial of Three Rivers' special permit application as set out in the Board's Notice of Decision was wholly unsubstantiated by the credible evidence at trial and did not support denial of the special permit. I further find that the denial unreasonably regulated the installation of solar energy facilities in contravention of § 3 of Chapter 40A. Furthermore, because on the facts found in this matter, "no rational view of the facts the court has found supports the [Board]'s conclusion that the applicant failed to meet one or more of the relevant criteria found in the governing statute or by-law," Britton v. Zoning Bd. of Appeals of Gloucester, supra, 59 Mass. App. Ct. at 74-75, an order requiring the issuance of the requested special permit is appropriate. An order for the issuance of a special permit is "appropriate where remand is futile or would postpone an inevitable result." Wendy's, supra, 454 Mass. at 388. See also Shirley Wayside Ltd., supra, 461 Mass. at 474, 485. Accordingly, the Board's Decision must be annulled and the special permit will be ordered to be issued. Judgment will enter in accordance with this decision. 





SO ORDERED 





FOOTNOTES
[Note 1] The Beebe Road Decision was issued on November 14, 2018, the day of the close of the public hearing for Three Rivers' Project. Tr. Vol. II, at 13. 

[Note 2] As discussed below, Pearsall later refined the methodology for calculating Maximum Building Coverage to be more precise, which he described as "Method 2." 

[Note 3] Notably, BlueWave's calculation of 31 percent for the Three Rivers' Project was markedly less than the figure of 48 percent included in the Decision as the basis for denial. 

[Note 4] Donald testified via Zoom from Alberta, Canada. 

[Note 5] Donald provided a caveat at trial because he had available only a PDF version of BlueWave's plans, rather than an electronic CAD set of plans. He explained that the level of specificity available from a PDF drawing is not as accurate as a it is from the actual CAD drawing. Tr. Vol. II, at 172. 

[Note 6] While there was testimony by Pearsall that at one or more sessions of the public hearing, one or more abutters to the Project raised their concern that the Project would cause a depreciation of the value of their homes and hurt potential sales, no testimony from these or an appraiser was presented at trial. 

[Note 7] The Board's counsel questioned Tyburski's qualifications since most of his work was done in eastern Massachusetts. In response, however, Tyburski explained that he grew up in the adjacent town of Palmer (neighboring Wilbraham to the east) and had done numerous appraisal assignments in the area, including among others a recent appraisal for the Registry of Motor Vehicles in Springfield and an assignment for Holyoke Community College, a dairy barn in Palmer and others. I find that Tyburski's qualifications, credibility and expertise were buttressed by testimony displaying a personal familiarity with landmarks, roadways and the like in and near Wilbraham, coupled with his extensive appraisal experience throughout the Commonwealth of Massachusetts since 1979. Tr. Vol. II, at 122-126. 

[Note 8] While the Board questioned the expertise of the appraiser as a non-neighbor to the Property, I found him to have considerable relevant personal and professional experience. Tyburski testified that he grew up in the town of Palmer, which neighbors Wilbraham to the east, and has conducted appraisals throughout the Commonwealth of Massachusetts since 1979. 

[Note 9] When the Board and Town officials made requests of Three Rivers for additional analysis or modifications to the proposed Project, in each instance, Three Rivers readily agreed to the requests and modifications. For instance, when the Board requested a Line of Sight Diagram to show how much of the solar array would be visible from the Swist home across Three Rivers Road and Three Rivers commissioned such a study. The Board and Town officials also suggested multiple modifications to Three Rivers' SES, including for instance additional buffering, reduction in the size of the solar array and drainage work, all of which were incorporated into multiple revisions of the Project plans. 

[Note 10] Pearsall had by then devised a new Method 2 for calculating Maximum Building Coverage, using only the area taken up by the footprint area of the solar panels row, the transformer pad and other structures and not the entire fenced-in-area. According to Pearsall, Method 2 was a more precise calculation, compared with Method 1 which was a "very crude, a rough first approximation." 

[Note 11] The Town's assistance to BlueWave went even further. Reidy also advised Pearsall that BlueWave would like to request Board approval for a modification to the Beebe Road layout. That change would densify the solar array by reducing the row spacing from twelve feet to eight feet and increasing building coverage on the site. In an email to Reidy, dated August 28, 2019, Pearsall gave instructions and advice to Reidy on how to perform the calculations for the modified solar array. Reidy followed Pearsall's instructions and on October 3, 2019, submitted to Pearsall on behalf of the Board a formal request for administrative approval of a modification to the Beebe Road SES with a densified solar array, enclosing revised plans and calculations for building coverage in accordance with Pearsall's instructions. The Board approved those modified plans at a meeting and without a public hearing. According to Pearsall, a public hearing was not warranted because the request was just an amendment to an existing special permit. 

[Note 12] Donald, a senior vice president and head of the United States region for AMP, is a licensed professional engineer, holding a bachelor's degree in electrical engineering from the University of Alberta and a Masters of Business Administration from the Haskayne School of Business at the University of Calgary. He has worked in the solar industry since 2005. In addition, Donald has held the position of chair of the board of directors of the solar industry association in Canada and sat as the renewable energy generator representative for the largest electric system operator in North America. Donald testified that at the time of trial, AMP had seven operating solar projects in Massachusetts, four under active construction and another twelve to fifteen under development. Donald has had active involvement in the engineering and design of Massachusetts' projects because of the need for detailed analysis of how solar energy interfaces with energy storage. Donald testified via zoom from Alberta, Canada. Donald provided a caveat at trial because he had available only a PDF version of BlueWave's plans, rather than an electronic CAD set of plans. He explained that the level of specificity available from a PDF drawing is not as accurate as a it is from the actual CAD drawing. 

[Note 13] In contrast, Donald was able to confirm from BlueWave's several submissions to Pearsall and the Board that its engineers did consider the tilt angle of the solar panels for the Beebe Road project. 

[Note 14] In October 2019, the Town adopted modifications to the Solar Bylaw, in part as a result of Three Rivers' Application. Among other changes, the 2019 Bylaw includes a new Section 10.7.6 (F), entitled "Lot Coverage," as Among other changes, the 2019 Bylaw includes a new Section 10.7.6 (F), entitled "Lot Coverage," as follows: "The maximum lot coverage for [SES] shall be twenty-five percent (25%) when located in residential zoning districts and fifty percent (50%) when located in commercial or industrial (non-residential) zoning districts. For the purposes of this section, lot coverage shall be measured as the total aggregate area of land covered by buildings, structures, associated equipment including solar panels and all land contained within the perimeter security fence and calculated as a percentage of the total area of the lot. 

[Note 15] Paragraph 15: "The size, scale and proximity of the proposed use will create a significant negative visual impact on the abutting residential neighborhood. Measures offered by [Three Rivers] to screen the proposed use from the view of abutting homes with fencing and landscaping would be inadequate and ineffective taking into consideration the large amount forest land to be cleared and the excessive lot coverage needed to accommodate the design of the proposed commercial solar array, the topography of the subject property and abutting land, and the close proximity of adjacent homes to the proposed use;" and Paragraph 20: "For the reasons listed herein, the size, scale and character of the proposed use will constitute a nuisance as a visually offensive structure and therefore does not meet the required finding for granting a Special Permit imposed under section 13.6.5.4 of the Wilbraham Zoning By Law." 

[Note 16] Paragraph 17: "For the reasons listed herein, the size, scale and character of the proposed use is not in harmony with the general purpose and intent of the Zoning Bylaw and therefore does not meet the required finding for granting a Special Permit imposed under section 13.6.5.1 of the Wilbraham Zoning By-Law;" Paragraph 18: "For the reasons listed herein, the size, scale and character of the proposed use is not suitably located in the neighborhood in which it is proposed and therefore does not meet the required finding for granting a Special Permit imposed under 13.6.5.2 of the Wilbraham Zoning By-Law;" and Paragraph 19: "For the reasons listed herein, the size, scale and character of the proposed use is not compatible with the character and scale of other similar uses permitted in the same district and therefore does not meet the required finding for granting a Special Permit imposed under section 13.6.5.3 of the Wilbraham Zoning By-Law." 


 
 Home/Search 
 Land Cases by Docket Number
 Land Cases by Date 
 Land Cases by Name
 


 Commonwealth of Massachusetts. Trial Court Law Libraries. Questions about legal information? Contact Reference Librarians.